**In the Matter of L.J., Appellant.**

**No. 88–151.**

District of Columbia Court of Appeals.

Submitted July 19, 1988.
Decided Aug. 18, 1988.

Richard Goemann, appointed by the court, and Shari D. Leventhal, Law Student, were on the brief, for appellant.

Frederick D. Cooke, Jr., Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Mary L. Wilson, Asst. Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Before TERRY and SCHWELB, Associate Judges, and REILLY, Senior Judge.

SCHWELB, Associate Judge:

Respondent L.J. was fifteen and a half years old in mid-June 1987 when, at or about 3:00 a.m., assisted by an 18 year old confederate, A.P.G., he fired an UZI automatic weapon at an automobile occupied by two men with whom he had quarreled, leaving seventeen bullet holes in the vehicle. In this unusual appeal, L.J. claims that the trial judge "abused his discretion" in not lifting a court-imposed restriction on his release from the Children's Center after he had been confined there for about half a year. We do not believe that this court, as an appellate tribunal, has the authority, on facts such as those here presented, to overturn the juvenile analogue to a sentencing decision where the trial judge's disposition order [1] is within legal limits. Moreover, assuming *arguendo* that this court has such authority, we conclude that the trial judge's decision was not only permissible but also consistent with the policies underlying the District's commitment to rehabilitation as the prime goal of the juvenile justice system.

I

Unfortunately, the appellate record before us is sparse. It does not include L.J.'s social file, or the predisposition report,[2] or a transcript either of the detention hearing following his arrest or of his guilty plea. Exclusion of these materials from the ap-pellate record restricts our capacity to deal comprehensively with the facts germane to this appeal. Nevertheless, from the limited record before us, we have been able to reconstruct much, if not all, of the context of this offense and of L.J.'s delinquent past. The tale is not a pretty one.

On June 14, 1987, a Metropolitan Police detective applied for custody orders [3] authorizing him to arrest L.J. and A.P.G., and for warrants permitting him to search the homes of each of the youths. He submitted an affidavit relating that two complainants had reported to the police that at 3:00 a.m.[4] they were seated in an automobile in the 600 block of Orleans Place, N.E. Respondent L.J., with whom the two men had argued over "lost money," [5] and his companion A.P.G., came out of a nearby alley. L.J. was armed with what appeared to be an "UZI" automatic weapon. A.P.G. had a handgun. Both young men began to fire at the complainants as they were seated in the vehicle. The complainants ducked and, making their escape, drove directly to the police station. Examination of the automobile by the police revealed that it had seventeen bullet holes, that two windows were shattered, and that the entire driver's side of the car appeared to have been sprayed with bullets.

The detective further reported in his affidavit that L.J. had previously been arrested for assault with intent to kill while armed in connection with a violent episode at the Masonic Temple in April 1987. Eleven persons had been shot on that occasion, and L.J. was awaiting trial. Another person charged in the Masonic Temple shooting was A.P.G.'s brother. Neither L.J. nor A.P.G. had a license for a gun and, accord-

---

1. In juvenile practice, disposition is the equivalent of sentencing. D.C.Code § 16–2320 (1981). In adult criminal practice, the word is generally used as meaning resolution of the case by a plea of guilty.

 Unless otherwise specified, all references in this opinion to the District of Columbia Code are to the 1981 edition.

2. This is the juvenile equivalent of the adult "presentence report." *See* D.C.Code § 16–2319.

3. The juvenile equivalent of an arrest warrant. *See* D.C.Code § 16–2306(c).

4. It is not clear whether this was the time of the report or the time of the incident.

5. L.J. later reported that the argument was really over threats to his sisters.

ing to the detective's affidavit, both were known drug dealers.

The warrants issued, and on June 15, 1987, a search warrant was duly executed at L.J.'s home. Officers found two guns, ammunition, and a bullet proof vest. One of the guns is described in the detective's report as "an automatic weapon, like an UZI."

On June 17, 1987, L.J. was arrested at the D.C. Courthouse, apparently while he was there in connection with one of his prior cases. He was charged in what became J–2317–87 with two counts of assault with intent to kill while armed and seven weapons offenses. On July 7, 1987, he entered a plea of guilty to two counts of the lesser included offense of assault with a dangerous weapon (gun)[6] in J–2317–87. The remaining charges in J–2317–87, and all charges in J–1523–87[7] were dismissed pursuant to a plea agreement.

At the time L.J. committed these offenses, he was, as the detective had sworn, on pretrial release for assault with intent to kill while armed in J–1523–87 (the Masonic Temple case). He was also on probation in J–2487–86 for possession of cocaine, apparently a reduced charge from distribution or possession with intent to distribute.[8] He had been adjudicated delinquent for driving without a permit (J–3098–86), and had a 1984 "consent decree"[9] in J–3764–87 in connection with charges of assault with a deadly weapon (rock) and for malicious destruction of property (felony).

6. D.C.Code § 22–502.

7. This was obviously the case involving the eleven shootings at the Masonic Temple.

8. Among the materials omitted from the appellate record are the documents relating to the probation offense. In light of Judge Richter's comment that L.J. was in trouble for selling drugs (see p. 434 *infra*) and the disclosure in the detective's affidavit that L.J. is a known drug dealer, however, we presume that the drug possession adjudication stemmed from distribution of unlawful drugs or possession of them with intent to distribute.

9. A consent decree is an agreed order of probation without admission of guilt. *See* D.C.Code § 16–2314.

It is evident from the foregoing that the instant case represented respondent's third adjudication (and at least his fourth arrest) in the year since mid–1986.[10] Moreover, when L.J. fired the UZI at the complainants, he was on release status pending trial in one case and had been placed on probation in another. It is uniformly made a condition, both of pretrial release and of probation, that the respondent promises to obey the law, so that L.J. had broken two promises to the court.[11]

Following L.J.'s guilty plea, Judge Robert Richter ordered that he be detained at Oak Hill pending disposition.[12] On July 27, 1987, after considering a predisposition report, Judge Richter committed L.J. to the custody of the Department of Human Services (D.H.S.) for a period of no more than two years, the maximum period permitted by law. *See* § 16–2322. Noting in handwriting on the printed form order that

respondent is a danger to himself and others because of violent conduct,

Judge Richter ordered that L.J. was not to be released to aftercare without the consent of a judge of the Family Division. The judge "retained" the case and scheduled a review hearing before him for January 28, 1988. L.J. was returned to Oak Hill in accordance with Judge Richter's order.

## II

From the beginning of his confinement, L.J. behaved very well at Oak Hill. In-

10. We discern this from the case numbers. If J–2317–87 was instituted in mid-June, J–2487–86 was probably filed in June or July of 1986.

11. L.J.'s failure to obey the law was not his only broken promise to the court. Although the release and probation conditions are not before us, 15 year olds charged with serious offenses are almost invariably subject to a curfew which would not permit them to be on the streets at 3:00 a.m., and are required to promise to abide by it. Judge Richter noted, in denying the motion to set aside the restriction on L.J.'s commitment, that L.J. had violated his curfew.

12. In the "adult" system, "disposition" ordinarily means "guilty plea." In the juvenile delinquency system, however, the word is a euphemism for sentencing, and is used to honor the non-criminal character of the proceedings. *See* D.C. Code § 16–2320 (1981).

deed, the appellate record is replete with favorable assessments of his conduct and demeanor by members of the staff at Oak Hill. As the prosecutor stated at the hearing on January 28, 1988,

> we understand that [L.J.] is doing very well, his behavior has improved; they're very pleased with his progress out there and consider him to be a model student.

Based on L.J.'s improved conduct, counsel soon filed a number of motions with the trial judge during the second half of 1987 asking him to lift the restriction temporarily to permit L.J. to go home for Thanksgiving, Christmas, and two funerals. One of these funerals, unhappily, was that of A.P.G., who had been charged with L.J. in the instant case, and who was shot to death at the age of eighteen in September 1987. Judge Richter denied each of the initial motions to lift the restriction.

On January 27, 1988, in connection with the scheduled review, counsel filed a motion to vacate the restriction entirely on the grounds that L.J. had been sufficiently rehabilitated to be placed in the community. In support of the motion, counsel presented evaluations and reports written by a psychologist, a teacher, and staff counselors attesting to L.J.'s exemplary behavior at Oak Hill. Also included in the supporting materials was an evaluation of L.J. by an independent clinical psychologist, Dr. Sarah Jane Elpern. Dr. Elpern concluded that L.J. was ready to return to the community, that he could no longer benefit from treatment at Oak Hill, and that he could avoid trouble by reestablishing his associations with friends from his earlier years and avoiding older youths, with whom he had been associating more recently, and who had led him into trouble. It was the view of the professionals who recommended L.J.'s release that he had learned to control his emotions and had recognized that further contact with firearms would have unfavorable consequences for him. Although Dr. Elpern and the representatives of D.H.S. alluded in general terms to the charges which had brought L.J. to Oak Hill, we are struck by the absence from these materials of any significant attention to the fact that this youngster, while on probation apparently arising from drug dealing, and on pretrial release for alleged assault with intent to kill while armed in connection with the shooting of eleven people, had sprayed automatic gunfire on an automobile occupied by two human beings. We are not dealing here with truancy or public urination or shoplifting. The ammunition was real. The potential for tragedy was fearsome.

At the hearing on the motion, counsel for L.J. presented the testimony of an Oak Hill social worker. That testimony, together with the evaluations and other documentation attached to the motion, reinforced the claim that L.J. had made an excellent adjustment at Oak Hill. Counsel claimed that L.J. had "learned his lesson" and could derive no further benefit from his confinement there. The government, which had not been served with the motion until the day preceding the hearing, orally opposed L.J.'s release "for the record" because of the violent character of the offense.

Judge Richter denied the motion to vacate the restriction on release. He noted that, although L.J. was doing "wonderfully" at Oak Hill, this case was not an isolated incident, for L.J. had made violent and dangerous choices in the past. Judge Richter observed that L.J. was on probation for selling drugs and on pretrial release for a shooting, "and then he does this." Judge Richter also stated that, according to documents in L.J.'s social file, L.J.'s behavior at home was poor prior to his commitment in this case, he was not doing well in school, and he was not keeping his curfew. Judge Richter questioned the reliability of Dr. Elpern's psychological report, alluding to her failure to explain how someone like L.J., with a history of violent conduct, could become a completely different person in six months. The judge rejected L.J.'s argument that his commitment to Oak Hill could no longer help him, noting that L.J. was thriving at that facility and, indeed, excelling for the first time in

his life.[13] He concluded that L.J. might be released in less than two years if the good behavior continued, but that it was "counter-intuitive" to conclude that L.J. was ready to live in the community.

This appeal followed.

## III

L.J.'s stated grounds of appeal are that the disposition judge abused his discretion in not removing the restriction on his commitment. He does not contend, nor can he, that a restricted commitment is not authorized by law where a juvenile has been convicted of assaulting two persons with a gun, or that the two year period exceeds the statutory maximum. *See* D.C. Code §§ 16–2320, 16–2322(a)(1). Although counsel's argument is framed in terms of alleged abuse of the trial judge's discretion, L.J.'s submission, when stripped of ingenious disguises, is essentially a plea for leniency. *Walden v. United States,* 366 A.2d 1075, 1077 (D.C.1977). Appellate courts do not entertain such pleas.

The refusal of the courts of this jurisdiction to review on appeal sentences which are within statutory limits, upon the ground that such sentences are too severe, is of long standing. In *Raymond v. United States,* 26 App.D.C. 250, 257 (1905), *cert. denied,* 200 U.S. 619, 26 S.Ct. 755, 50 L.Ed. 623 (1906), the court put it this way:

> The power to affix the penalty upon conviction is vested exclusively in the trial court, and the appellate court is vested with no jurisdiction in respect of the exercise of that power, provided it does not exceed the statutory limit.

More recently, this court has recognized that

> "In the act of sentencing, the judge approaches the attribute of the Almighty— he sits in judgment of his fellow man...." [14]

To sit in judgment of a man while looking him in the eye and knowing him in some way first hand is one thing, but to do so only by way of the dispassionate and remote confines of an appellate record, no matter how elaborately composed, is quite another.

The judgment that this court should not enter the area of reviewing the excessiveness of sentences is one not easily arrived at. Indeed, reasonable men[15] may and do differ on the subject. However, absent legislative direction that we must undertake such a task, and firm guidance as to applicable standards for such review, we hold we may not do so. *Foster v. United States,* 290 A.2d 176, 178– 179 (D.C.1972). *See also Walden v. United States, supra,* wherein this court reemphasized that

> our precedents demonstrate the fact that it is not our role to review sentences which are within statutory limits,

366 A.2d at 1076, and that this is true even where "the prisoner presents an affecting case for reconsideration of the sentence." *Id.* at 1077.

This does not mean, of course, that the sentencing process (as distinguished from the severity of a statutorily authorized sentence) is immune from appellate scrutiny. *Dorszynski v. United States,* 418 U.S. 424, 443, 94 S.Ct. 3042, 3052, 41 L.Ed.2d 855 (1974); *United States v. Stoddard,* 180 U.S.App.D.C. 209, 553 F.2d 1385 (1977). As the court articulated the principle in *Stoddard:*

> So, as we have previously recognized, appellate review of the sentencing process is in order where, for example, it is contended that the sentencing judge relied on improper or inaccurate information, that the defendant was not represented by counsel at sentencing, that the prosecutor violated his agreement not to allocute at sentencing or that a stiffer

---

13. We do not think that, by this comment, the judge intended to suggest that doing well while locked up constitutes an argument against release. Such a doctrine would surely provide the residents of institutions like Oak Hill with rather skewed incentives.

14. This quotation is from *Leach v. United States,* 115 U.S.App.D.C. 351, 353, 320 F.2d 670, 672 (1963).

15. Or women.

sentence was imposed because a defendant asserted his innocence at trial. The Supreme Court has also made plain that we are authorized to reexamine the sentencing process where it is alleged that the judge totally failed to exercise his discretion in imposing sentence.[16]

180 U.S.App.D.C. at 213, 553 F.2d at 1389. *Accord Walden v. United States, supra*, 366 A.2d at 1077. So far as we can determine, however, L.J. does not fault the process by which the disposition in this case was reached, but rather the substantive result of the process—namely, that the judge has not seen fit to lift the restriction on L.J.'s commitment, so that he will continue for the. time being to be confined at Oak Hill, albeit for a period which is, so far, well within statutory limits.

■ In the present case, of course, we are dealing with a juvenile proceeding, and not with a criminal sentencing. This court has previously held in *In re T.L.J.*, 413 A.2d 154, 158 (D.C.1980) that

> disposition hearings are the juvenile equivalent of adult sentencing proceedings. When the trial court rules in such a proceeding within the limitations established by statutes, it is not our function to review that exercise of discretion.

*Accord In re J.L.C.*, 108 Daily Wash.L. Rptr. 2345 (Super.Ct.D.C. June 9, 1980). The rule generally precluding review of lawful sentences thus applies to dispositions in juvenile delinquency cases as well.

■ This court did observe in *In re T.L.J.*, that in ordering the extension of a juvenile commitment beyond the two year period pursuant to § 16–2322(b)(2), a trial judge must specify whether the action is being taken, as the statute requires either (1) for the protection of the juvenile; or (2) for the protection of the public interest. 413 A.2d 159. We suppose that this leaves

the door open just a smidgen [17] for an appellate court to examine what a trial judge did, although in *In re T.L.J.* the disposition judge was extending the term of the original commitment under a statute which required him to make appropriate findings, while no comparable requirement is at issue here. That smidgen, however, relates only to errors of law, and is not to be treated as so substantial that it emasculates the basic rule. Rather, it embraces only the extraordinarily rare case in which the judge has failed altogether to exercise discretion or has applied legally impermissible criteria which undermine the proceedings.

We are not unmindful that appellate courts in other jurisdictions, usually in extreme situations, have set aside commitments of juveniles which were for a period not exceeding the maximum set by statute. An example of such appellate intervention is *Ford v. Grenada County Youth Court*, 214 So.2d 462 (Miss.1968). The stark facts of that case are described in the first paragraph of the appellate opinion:

> This is an appeal from an order of the Chancery Court of Grenada County, Youth Court Division, dated August 4, 1967, in which the appellant, at that time an eleven year old Negro boy, was held to be a delinquent for having stolen and sold a wash pot of the value of $3. The order committed him to the Oakley Training School and required that he remain there until paroled or discharged therefrom, according to law, but he was not to remain there after he had attained the age of twenty years.

The Supreme Court of Mississippi, without explaining its reasons or articulating the basis for its exercise of appellate jurisdiction, vacated the commitment and remanded the case.[18] *See also In re Walter*, 172

---

**16.** A "total failure" to exercise discretion results where the trial judge incorrectly believed himself bound by a recommendation in a sentencing report, or where he declared he would *never* use the Youth Corrections Act for a particular kind of offense. *United States v. Stoddard, supra*, 180 U.S.App.D.C. at 213, n. 20, 553 F.2d 1389, n. 20. That phrase is obviously not appli-

cable to a judge's imposition of a statutorily authorized disposition.

**17.** Or perhaps "scintilla," if that scintillating word beloved only by lawyers should ever be used at all.

**18.** As a matter of historical interest, the author of the appellate opinion in the *Ford* case was

N.W.2d 603 (N.D.1969) (commitment of first offenders to State Industrial School "to help quiet public indignation" held incompatible with rehabilitative emphasis of statute and, especially, with provision requiring confidentiality of proceedings; review was apparently for legal error, not for abuse of discretion).

▮ We need not decide whether the limited scope of this court's review of disposition orders in juvenile delinquency cases, as described above, would permit appellate intervention in extreme cases like *Ford.* [19] For reasons outlined above—and in this respect we think we state the obvious—we are satisfied that in this case there was no error of law, nor complete failure to exercise discretion, nor resort by the judge to impermissible considerations.

## IV

L.J. contends that the judge abused his discretion, or perhaps committed error of law, by "arbitrarily" rejecting the advice of the Department of Human Services and of Dr. Elpern and by failing to act in accordance with the rehabilitative goals of the District of Columbia's juvenile dispositional scheme. We disagree.

▮ A. The judge acted within his statutory authority when he maintained L.J.'s commitment to Oak Hill. When a trial judge specifies at disposition, as Judge Richter did here, that he is retaining veto power over release, D.H.S. cannot independently authorize release of the child. D.C. Code § 16-2322(a)(1); *In re J.M.W.,* 411 A.2d 345 at 348 n. 3 (D.C.1980); *In re J.J.,* 431 A.2d 587, 591 n. 9 (D.C.1981). The court's veto power means that the court, and not the agency, has exclusive authority to determine when release is appropriate. The court is not bound to release the child whenever D.H.S. is of the opinion that release is appropriate in the best interests of the child. Such a result would render the

statute meaningless. There would be no purpose in retaining veto power over release if the judge were always obligated to rubber stamp D.H.S.'s recommendation of early release. *Cf. In re A.A.I.,* 483 A.2d 1205, 1208 (D.C.1984) (trial court's statutory authority to designate a particular placement for a delinquent juvenile would serve no purpose if the agency need not follow through with that placement.) Here, the imposition of a restriction on L.J.'s release would have been a futile act if the court did not retain discretion to make an independent determination as to when release would be appropriate.

The decision in *In re T.L.J., supra,* reinforces what is plain from the statute, namely that the trial court has the authority to maintain a juvenile's commitment even if the custodial institution recommends to the contrary. In *T.L.J.,* as in the present case, the court committed the respondent to a juvenile facility for up to two years, and specifically retained veto power over release. Shortly before the expiration of the two year period, the Corporation Counsel moved for a one year extension of the commitment order pursuant to D.C. Code § 16-2322(b)(2). It was the custodial agency's opinion, however, that the restriction on release should be removed. 413 A.2d at 156. The disposition judge granted the motion for extension, with restrictions, over the agency's objection. This court affirmed the disposition judge's authority to do so:

> Once a motion [to extend commitment] is properly before the court, *notwithstanding the recommendation of the custodial institution,* the court may grant the extension if the court finds it necessary (1) for the rehabilitation of the juvenile or (2) for the protection of the public interest.

*Id.* at 517 (emphasis added).

▮ Our conclusion is further bolstered by the provisions of D.C.Code § 16-2324.

Justice Tom Brady, a virulent segregationist, who also wrote BLACK MONDAY, a savage attack on the Supreme Court's school desegregation decision in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). BLACK MONDAY became the prime source of ideological inspiration for the members of the

white supremacist Citizen's Councils during the late 1950's and early 1960's.

**19.** Racial considerations, whether applied overtly or covertly, obviously form an impermissible basis for a decision as to the disposition of a juvenile.

That section provides that, when the court commits a child to an institution but does not retain veto power over release, and the institution denies that child's application for early release, the child may then move the court to modify or terminate the order of commitment. The court is authorized to grant the motion if it finds such action to be necessary to safeguard the welfare of the child or the public interest. This statutory procedure would also be meaningless if the court were without authority to act independently of the agency's recommendation.

▆▆▆▆ It is true that, where the disposition judge has not restricted a commitment, the rehabilitation of a committed juvenile is a matter generally relegated to the expertise of the various parts of the executive branch of government, including D.H.S. and Oak Hill. *In re A.A.I.*, 483 A.2d 1205, 1209 (D.C.1984); *In re J.J.*, 431 A.2d 587, 593 (D.C.1981). In light of this presumed expertise, the parties have analogized the present issue in their briefs to the question whether, and under what circumstances, a trial judge may rule contrary to expert testimony. But Judge Richter's function, first in initially deciding whether to commit L.J. restrictively, and later in ruling on L.J.'s motion to set aside the restriction, was not simply one of fact finding. On the contrary, it was his obligation to exercise his virtually unreviewable discretion, *In re T.L.J., supra*, first to select a disposition which was authorized by statute and then to determine if he should grant a request for leniency. We therefore question the relevance of the authorities presented by the parties with respect to the weight to be accorded to expert testimony, for the analogy is imprecise. We hold simply that the judge was authorized, after considering the recommendations of D.H.S. and Dr. Elpern, to reject them if he found them unpersuasive.

B. We agree with L.J.'s contention that the District of Columbia is firmly committed to a rehabilitative approach to juvenile justice. As the Supreme Court explained in *Kent v. United States*, 383 U.S. 541, 554–555, 86 S.Ct. 1045, 1053–1054, 16 L.Ed. 2d 84 (1966):

> The theory of the District's Juvenile Court Act, like that of other jurisdictions, is rooted in social welfare philosophy rather than in the *corpus juris*. Its proceedings are designated as civil rather than criminal. The Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct. The objectives are to provide measures of guidance and rehabilitation for the child and *protection for society*, not to fix criminal responsibility, guilt and punishment. The State is *parens patriae* rather than prosecuting attorney and judge.

(Emphasis added as to words "protection for society".)

The words "protection for society" were not, however, included in this passage fortuitously. As Chief Judge Bazelon, who was surely as committed to rehabilitative principles as any jurist in this jurisdiction, commented for our federal appellate court at a later stage of the *Kent* case,

> *Parens patriae* requires that the juvenile court do what is best for the child's care *so long as this disposition provides adequate protection for society.*

*Kent v. United States*, 130 U.S.App.D.C. 343, 346, 401 F.2d 408, 411 (1968) (emphasis added).

▆▆▆ Curiously, neither party to this litigation has cited the landmark case of *Schall v. Martin*, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), in which the Supreme Court sustained the constitutionality of preventive detention of juveniles to protect the community even prior to adjudication of delinquency. As the Court stated in *Schall:*

> The "legitimate and compelling state interest" in protecting the community from crime cannot be doubted. *DeVeau v. Braisted*, 363 U.S. 144, 155 [80 S.Ct. 1146, 1152, 4 L.Ed.2d 1109] (1960). See also *Terry v. Ohio*, 392 U.S. 1, 22 [88 S.Ct. 1868, 1880, 20 L.Ed.2d 889] (1968). We have stressed before that crime prevention is "a weighty social objective," *Brown v. Texas*, 443 U.S. 47, 52 [99 S.Ct.

2637, 2641, 61 L.Ed.2d 357] (1979), and this interest persists undiluted in the juvenile context. *See In re Gault, supra*,[20] at 20, n. 26 [87 S.Ct. at 1440, n. 26]. The harm suffered by the victim of a crime is not dependent upon the age of the perpetrator.

If the protection of the public from crime can serve as a basis for detaining a juvenile whose guilt has not been adjudicated, it is surely an appropriate consideration in determining whether, and for how long a period, a judge may keep behind bars a youngster who has been found guilty, on his plea, of serious armed offenses.

The statutes, court rules, and decisional law of this jurisdiction are in full conformity with the foregoing principles. D.C.Code § 16–2310(a) provides in pertinent part that a child shall not be placed in detention prior to a factfinding hearing or a dispositional hearing unless it appears from available information that detention is required "to protect the person or property of others or of the child." This section authorizes the *pretrial* detention of a juvenile to protect the *property* of others, surely a far more controversial step than Judge Richter's actions in this case.[21] Section 16–2322(b)(2) authorizes the extension of a juvenile's commitment beyond the statutory two year period if such a step is necessary for the child's rehabilitation *"or the protection of the public interest." See In re T.L.J., supra.* Section 16–2324 provides that the court may grant or deny a motion to modify or terminate a commitment "if it finds such action necessary to safeguard the welfare of the child *or the interest of the public." See also* H.R.Rep. No. 91–907, 91st Cong., 2d Sess., 44 (1970) U.S.Code Cong. & Admin.News 1970, p. 551 (disposition of a child after adjudication shall be made in the best interest of the child *and community* ).

 The appellate courts of this jurisdiction have long recognized, in conformity with the foregoing statutory provisions,

that in making a decision respecting detention, the disposition judge may consider the safety of the community as well as the juvenile's needs, and that the informed exercise of discretion in that regard will rarely be disturbed on appeal. *Creek v. Stone*, 126 U.S.App.D.C. 329, 334, 379 F.2d 106, 111 (1967); *In re R.D.S.*, 359 A.2d 136, 138 (D.C.1976). Under these circumstances, we are unable to agree with counsel for L.J. that the emphasis on rehabilitation in the District's juvenile system means that "a broader focus on other possible interests is not within the statutory language." [22] Where, as in this case, a youngster sprayed a vehicle occupied by fellow human beings with automatic weapons fire while he was both on probation in a drug case and on pretrial release in connection with another armed offense, it surely defies reason and common sense to say that the disposition judge may not consider, in a very serious way, the implications for public safety of a decision to release the respondent to the community only a few months after his commitment.

C. In *Schall v. Martin, supra,* the Supreme Court also held that

> the juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's *parens patriae* interest in preserving and promoting the welfare of the child.

467 U.S. at 265, 104 S.Ct. at 2410. The Court stated that society has a legitimate interest in protecting a juvenile from the consequences of his criminal activity—

> both from potential injury which may be suffered when a victim fights back or a policeman attempts to make an arrest and from the downward spiral of criminal activity into which peer pressure may lead the child.

*Id.* at 266, 104 S.Ct. at 2411. Quoting liberally from the decision of the New York Court of Appeals sustaining the constitutionality of the state's juvenile preventive

---

**20.** *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

**21.** *See also* Super.Ct.Juv.R. 106 (criteria for detention of a juvenile).

**22.** Reply brief, pp. 4–5.

detention statute,[23] the Court observed that recidivism among juveniles is more common than among adults because the consequences are often less drastic, and because juveniles often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them. *Id.* at 266, 104 S.Ct. at 2411.

Although we are reluctant to tell any human being that he is being locked up "for your own good," this case may be one in which L.J.'s loss of liberty, without even considering its effect on others, has been beneficial to him. As Judge Richter pointedly observed in denying L.J.'s motion to lift the restriction, a structured environment like Oak Hill appears to be the only setting in which this youngster has done well. His alleged companion in the crime, A.P.G., who apparently remained at liberty, is dead at the age of eighteen under tragic circumstances—another of the far too numerous young lives violently extinguished during this crime-plagued period in our lovely but troubled city.[24]

L.J.'s potential for recidivism is readily discernible from his history during the year preceding his detention, and the discovery of an automatic weapon, a pistol, a bullet proof vest and ammunition at his home gives us little reassurance that the instant armed offense, allegedly not the first, would have been his last. Next time, he might well have been transferred to the felony division for prosecution, and might have faced life behind bars. *See* D.C.Code § 16–2307(a)(1). Indeed, in light of the nature of the charges in the Masonic Temple case, this could well have happened to him in connection with the instant offense.

Finally, we note that rehabilitation is not necessarily synonymous with leniency. A slap on the wrist for a serious offense may often be counterproductive from a rehabilitative perspective. Anyone who has worked with juvenile delinquents in this city, or presided over delinquency cases, knows that many of these youngsters have lived disordered lives into which rationality and predictability rarely intrude. So far as this sparse record reveals it, L.J.'s background is not atypical in this regard. According to the social materials presented by his counsel, L.J. is the third of his mother's nine children. His father is incarcerated. L.J. has been in the criminal drug subculture in his relatively early teens. He has a learning disability. Despite some apparent intellectual potential, he has an I.Q. of 80 and reads at or below the third grade level.

When a youngster finds himself in this situation, with obviously limited resources to call upon, his ability to discern a link between conduct and consequences tends to atrophy. One does not have to be a psychiatrist, a psychologist, or a social worker to observe that, among deprived delinquents living chaotic lives, instant self-gratification counts for far more in decision-making than the future consequences of one's conduct. If, even when measured in the context of the relatively lenient juvenile system, the unfavorable consequences of a serious crime are trivial, the urge for immediate gratification is surely reinforced.

Under these circumstances, a disposition judge may reasonably conclude that the judicial system can significantly contribute

**23.** "Because of the possibility of juvenile delinquency treatment and the absence of second-offender sentencing, there will not be the deterrent for the juvenile which confronts the adult. Perhaps more significant is the fact that in consequence of lack of experience and comprehension the juvenile does not view the commission of what are criminal acts in the same perspective as an adult.... There is the element of gamesmanship and the excitement of 'getting away' with something and powerful inducement of peer pressures." *People ex rel. Wayburn v. Schupf,* 39 N.Y.2d 682, 687–688, 385 N.Y.S.2d 518, 519–521, 350 N.E.2d 906, 908–909 (1976).

**24.** The record does not reveal the precise circumstances of A.P.G.'s violent death. Dr. Elpern's report states, however, that L.J.'s

> stay at Oak Hill and the knowledge that one of the peers involved in criminal activity was killed precisely because of that activity have shown him that the positive feelings that he might have derived from hanging around with these people would only be ephemeral.

This passage apparently relates to the death of A.P.G., for a motion to lift the restriction was filed on behalf of L.J. so that he could attend A.P.G.'s funeral.

to the rehabilitation of a delinquent by teaching him that conduct does have consequences and that, so far as the judge can make them so, the results of antisocial behavior are predictable. Many, perhaps most, youngsters can respond to a rational message. If you do well, good things happen to you. If you commit a little crime, you pay a little price. If you commit a greater crime, the pain is a little greater. A first offense can often be treated leniently, but if you do it again, you are subject to an escalating series of winces—*and you had better believe it because the judge does not promise severe consequences and then just slap your wrist.* That is an approach that a youngster can at least potentially understand.

Applying this principle—which is in some measure implicit in Judge Richter's approach, as reflected in his comments from the bench—a disposition judge could rationally conclude that release of L.J. so soon after the commission of this particularly violent offense, under the troubling circumstances existing here, would be premature. In conformity with that assessment, he could reasonably believe that to grant L.J.'s motion would convey the message that things do not get too bad even if you use automatic weapons against those who cross you. It would be reasonable for the judge to consider such a message to L.J. counter-rehabilitative because it is incompatible with the need to persuade him that there exists a rational and proportional relationship between conduct and consequences.[25] Nothing in our law precludes this approach, which is surely consistent with common sense. If a judge finds it persuasive, he is not required to follow recommendations from professionals whose views are different.

L.J. has already received many of the benefits of the District's rehabilitative juvenile system. He could have been prosecuted as an adult, § 16–2307, but was not. His maximum loss of liberty, barring any intervening event which might occasion a motion to extend commitment, is two years at Oak Hill instead of several decades in an adult prison. He cannot be impeached with his juvenile adjudications if he testifies in the future. *See Brown v. United States,* 119 U.S.App.D.C. 203, 207, 338 F.2d 543, 547 (1964); *Smith v. United States,* 392 A.2d 990, 993 (D.C.1978). The proceedings against him are confidential, and he is known to the reader only by his initials. D.C.Code § 16–2331. Even if he serves the full two years—and Judge Richter has indicated that he may be released earlier if he continues to do well—L.J. will have avoided the far more severe consequences which he would have encountered if he had been tried as an adult. Under these circumstances, Judge Richter's resolution of the case has been compatible with the rehabilitative character of our juvenile system, and there is no sound reason for this court to intervene.

V

For the foregoing reasons, the judgment appealed from is

AFFIRMED.

---

**25.** The message to L.J.'s friends if he were prematurely released would also be questionable.