**In re D.R.J., Appellant.**

**Nos. 98–FS–984 to 98–FS–986.**

District of Columbia Court of Appeals.

Argued May 20, 1999.
Decided July 15, 1999.

Gretchen Franklin, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Rosalyn Calbert Groce, Director, Policy and Appeals Branch, Office of the Corporation Counsel, with whom John M. Ferren, Corporation Counsel at the time the brief was filed, and Robert R. Rigsby, Deputy Corporation Counsel, were on the brief, for appellee.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

FARRELL, Associate Judge:

The juvenile transfer statute, D.C.Code § 16–2307 (1997), contains "a rebuttable presumption that a child 15 through 18 years of age who has been charged with [murder]" (among other enumerated violent crimes) "should be transferred for criminal prosecution in the interest of public welfare and the protection of the public security." § 16–2307(e–2). In essence, the presumption is that such a youth offender is too dangerous to be left to the uncertainty of rehabilitation in the juvenile system. The trial judge, in ordering D.R.J.'s transfer, ruled that as a juvenile charged with murder, he bore "the burden of rebutting by a preponderance of the evidence the presumption" of dangerousness.

We hold, instead, that while the statute requires the juvenile to come forward with evidence rebutting the presumption, it does not impose on him the burden of persuasion. That burden remains on the government which, with or without the benefit of the unrebutted presumption, must prove by a preponderance of the evidence that transfer is dictated by the public safety. We hold as well that, even when the presumption has been rebutted, it retains evidentiary significance (the

"bubble" does not "burst"), and the legislative determination that juveniles charged with an enumerated crime present a distinct danger to public safety may still be considered by the judge in deciding whether transfer is required by the public welfare. Finally, we hold that any error by the trial judge in allocating the burden of proof here was harmless in light of the evidence demonstrating that D.R.J. was dangerous and that there were no reasonable prospects of his rehabilitation in the juvenile system.

## I.

The government's motion to transfer appellant stemmed from three separate charges brought against him: two charging him with the murder of Tia Mitchell and Nathan Jones, respectively, and one charging him with assault on Duane Simmons with intent to murder. All three alleged offenses occurred when D.R.J. was 15 years old. The allegations were that he shot Mitchell to death because of her association with a person and a "crew" responsible for slaying a member of D.R.J.'s crew; that he shot Simmons—also a member of the other crew—repeatedly in the back, leaving him paralyzed; and that he shot Jones in the back of the head after apparently losing to him in a crap game. For purposes of transfer, it must be "assume[d] that the child committed the delinquent act alleged." D.C.Code § 16–2307(e–1). At an evidentiary hearing, the judge heard evidence concerning the twofold determination he was obliged to make, *viz.*, whether transfer "is in the interest of the public welfare and protection of the public security and [whether] there are no reasonable prospects for rehabilitation." D.C.Code § 16–2307(d). We defer consideration of the evidence until later, and deal first with the legal issue of what proof the

juvenile need present to overcome the statutory presumption of dangerousness.

## II.

In *In re J.L.M.*, 673 A.2d 174 (D.C. 1996), the court explained the manner in which, at least as to juveniles charged with the enumerated violent crimes, the legislature in 1993 had amended the transfer statute to make the public welfare and safety a consideration coequal in importance with the likelihood of rehabilitation of the juvenile, which theretofore had been the exclusive statutory focus. *See id.* at 178–79; *see also In re S.M.*, 729 A.2d 326, 328 n. 4 (D.C.1999). In particular, we pointed out that by establishing the rebuttable presumption of § 16–2307(e–2) applicable to such crimes, the Council of the District of Columbia "appeared to reduce if not eliminate any evidentiary burden on the District created by the new public welfare/security criterion." *J.L.M.*, 673 A.2d at 179.[1] But while pointing out that, as to "cases against juveniles *not* involving violent crimes" the government "now has the evidentiary burden to satisfy two criteria" before transfer may be ordered, *id.* at 181 (emphasis added) (citing amended Super. Ct. Juv. R. 109(c)), the court had no occasion to consider whether the presumption relating to violent crimes shifts that burden to the juvenile or instead requires a lesser showing to rebut it. That issue is presented here.

■ It is not an easy one to decide, as evidenced by the fact that in revising Super. Ct. Juv. R. 109(c), the Superior Court Board of Judges (and its Rules Committee) took no apparent position on the issue. The amended rule states that *"[e]xcept as provided by D.C.Code § 16–2307(e–2),* the Corporation Counsel shall have the burden of showing by a preponderance of the evidence [both that the public safety favors transfer and that there are *no* reasonable

---

1. Before this presumption was enacted, the District had had " 'the burden of showing by a preponderance of the evidence' that ... there were no 'reasonable prospects for reha-

bilitating' the juvenile 'prior to his [or her] majority.' " *J.L.M.*, 673 A.2d at 178 (quoting former Super. Ct. Juv. R. 109(c) (1995)).

prospects of the offender's rehabilitation in the juvenile system]" (emphasis added). The "except[ion]" could mean either that the § 16–2307(e–2) presumption shifts the burden of persuasion on dangerousness or that it only (but importantly) aids the District in meeting its burden of proof, especially if unrebutted. But whatever the rule means, this court's task is to construe the statute, which is itself silent on how the presumption affects the burden of proof. As the parties also agree, nothing in the legislative history sheds helpful light on the point.[2] We nevertheless conclude, for the reasons that follow, that the presumption was intended to place the burden of coming forward with evidence on the juvenile, but not the burden of persuasion. That is, the District retains the obligation to prove by a preponderance of the evidence that transfer is dictated by the public safety, just as it must prove no reasonable prospects of rehabilitation. *See S.M., supra.*

This allocation of the burden comports first of all with the fact, which the government does not dispute, that the District continues to have the burden of persuasion on the rehabilitation prong of the transfer standard.[3] Even with the addition of the presumption, it would be conceptually anomalous to have differing burdens of proof on factors that, as we stressed in *J.L.M., supra,* are closely interrelated, so much so that "the presumption typically can be rebutted only by an evidentiary showing that the juvenile is amenable to treatment or rehabilitation." 673 A.2d at 182. Furthermore, our decision in *S.M., supra,* which dealt with the meaning of "reasonable prospects for rehabilitation," presupposed

that the government retained the burden of proof on dangerousness when it rejected the notion that the "possibility" of rehabilitation, rather than probability, was enough to defeat transfer. The legislature, we said, did not mean "to countenance [a] result" whereby "[t]he government, perhaps on the basis alone of the juvenile's failure to rebut the presumption of dangerousness, *has proven* that the public welfare dictates transfer[,] yet transfer fails because it has not *also disproven* every rational (non-fanciful) possibility of rehabilitation." 729 A.2d at 329 (emphasis added; footnote omitted).

Placing the burden of production but not persuasion on the juvenile also conforms to the way in which presumptions are generally understood. *See* FED. R. EVID. 301; GRAHAM C. LILLY, AN INTRODUCTION TO THE LAW OF EVIDENCE § 18, at 54–55 (1978 ed.); McCORMICK ON EVIDENCE § 342, at 450 (4th ed.1992). This court has stated that a presumption normally may be rebutted by presentation of "proof in contradiction" of it or "evidence against the fact presumed." *Green v. District of Columbia Dep't of Employment Servs.,* 499 A.2d 870, 874 (D.C.1985). This impresses us as the correct test in regard to the transfer of juveniles for criminal prosecution, a decision we have termed "a vitally important one" affecting "not only the [juvenile's] length of confinement but many collateral interests such as the loss of [his] civil rights ...." *Logan v. United States,* 483 A.2d 664, 676 (D.C.1984) (quotation marks and citation omitted). "*Where* the burden of persuasion lies may make a practical difference to a ... judge genuinely uncertain

---

**2.** The District merely points out that the presumption reflects the legislature's "perceived concern about the increased criminal conduct by juveniles," and the need for stronger court procedures dealing with "dangerous and violent juveniles who commit acts of random violence and drive-by shootings." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 9–374, "CRIMINAL AND JUVENILE JUSTICE REFORM ACT OF 1992," at 2 (Nov. 5, 1992).

**3.** This was made clear by rule before the 1993 amendments introduced the public safety as a factor, see note 1, *supra;* and nothing in the statutory changes reveals that the Council intended to shift the burden of proof on the rehabilitation issue. In *J.L.M., supra,* we recognized that the statutory changes "leav[e] the District with the burden of showing that 'there are no reasonable prospects for rehabilitation.'" 673 A.2d at 182.

on the basis of what the parties have presented." *United States v. Jessup*, 757 F.2d 378, 381 (1st Cir.1985) (Breyer, J.) (emphasis added). Given the importance of the transfer decision, we are reluctant to "interpret[ ] ambiguous [statutory] language [so as] to mandate" transfer of a juvenile where the evidence before the judge on the issue of dangerousness "is indeterminate." *Id.*

*Jessup* interpreted a provision of the federal bail statute containing a rebuttable presumption that a person charged with a serious drug offense will likely flee before trial and/or be a danger to the community. *Id.* at 379; *see* 18 U.S.C. § 3142(e). Federal courts of appeals considering the issue have agreed, expressly or impliedly, with Judge (now Justice) Breyer's conclusion that this presumption shifts the burden of production but not of persuasion to the defendant. *See, e.g., United States v. King*, 849 F.2d 485, 488 (11th Cir.1988); *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir.1986); *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir.1986); *United States v. Portes*, 786 F.2d 758, 765 (7th Cir.1985). The analogy to pretrial confinement, which *Jessup* termed "a most severe restriction," 757 F.2d at 381, is apt here, and these decisions thus support our understanding of § 16–2307(e–2)'s presumption.

■ *Jessup* aids our analysis in an additional way. Judge Breyer saw merit in the government's concern that "a 'burden of production' presumption would have little practical effect" because "a defendant can always provide the magistrate with *some* reason to believe him a good risk," 757 F.2d at 382–83 (emphasis in original)— or, in terms of our case, to believe him a good prospect for rehabilitation. He thus

agreed that if the presumption, once rebutted, were merely a "bursting bubble" having no further place in the judge's determination, that "could undercut the legislative purpose in creating the presumption." *Id.* at 383. He therefore concluded that Congress had meant the presumption, even when rebutted, to remain in the case as an evidentiary element to be weighed by the judge along with all of the other evidence. "In order to 'rebut' the presumption, the defendant must produce some evidence; and the . . . judge should then still keep in mind the fact that Congress has found that offenders, as a general rule, pose *special risks of*" the kind underlying the presumption. *Id.* at 384 (emphasis in original). So too, considering the Council's intent "to ease the way to transfer" of juveniles charged with committing violent crimes, *S.M.*, 729 A.2d at 328; see note 2, *supra*, we construe § 16–2307(e–2) as embodying this "middle ground" approach whereby the presumption, even rebutted, still retains "the value of evidence." *Jessup*, 757 F.2d at 383 (citation and internal quotation marks omitted).[4]

### III.

■ The previous discussion makes clear that the trial judge erred in putting the burden on D.R.J. to rebut by a preponderance of the evidence the presumption of dangerousness. We further assume, without deciding, that D.R.J. satisfied the lesser burden of production that the presumption imposed on him. But "it does not follow that the [government] failed to meet its burden of persuasion simply because the defendant rebutted the presumption . . . which flowed from the statute." *Commonwealth v. O'Brien*, 423 Mass. 841, 673 N.E.2d 552, 559 (1996).[5] Nor does it fol-

---

4. Judge Breyer reasoned that "[t]he case for a 'middle ground' position is particularly strong in [the] setting of a detention hearing, where the procedures are informal and there is no jury." A "bursting bubble" approach, by contrast, "would call on the judge . . . to consider the presumption and then, if it is met with contrary evidence, to erase the presumption

from his mind—not a task that is psychologically easy to accomplish." 757 F.2d at 383. This same consideration applies to a transfer hearing.

5. Mass. Gen. Laws ch. 119, § 61 (1994), repealed in October 1996, "create[d] a rebuttable presumption in murder cases that a juve-

low that because the trial judge misallocated the burden of proof we must reverse and remand. The judge found that the District had met its burden of proving that there were no reasonable prospects that D.R.J. can be rehabilitated in the juvenile system before he reaches majority. The evidence compellingly supports that conclusion. Given "the close relatedness" of the public safety and rehabilitation inquiries, *S .M.*, 729 A.2d at 329, we have no doubt that the judge, having found in the District's favor on the second, would have reached the same conclusion on the first had he correctly applied the rebuttable presumption.

As indicated, D.R.J. was charged with three calculated acts of murder or, attempted murder, two of them prompted by his apparent desire to exact retaliation against members of a rival "crew." The evidence that he remained dangerous to society despite the possibility of rehabilitation by age 21 (described by one of his expert witnesses as only "some hope") was very strong. The parties each presented testimony by mental health experts. Dr.

Joan Kinlan, a psychiatrist, testified that she found D.R.J. "seriously dangerous to the public" because of the crimes he was presumed to have committed and a prior charge of reckless driving, his "disregard[ ][for] the rules of society," his aggressiveness, and his lack of responsibility and empathy.[6] She believed that if he were treated for at least ten years, in "a totally locked contained facility with no possibility that he might escape," he could be rehabilitated, but that "[a] youth residential placement for four years until he is 21 could not provide rehabilitation." A psychologist, Dr. Mary Donnelly, similarly testified that D.R.J. exhibited "very little insight" into his problems and would require ten years of treatment to eliminate his risk for violence. Dr. Thomas Goldman, a psychiatrist called by D.R.J., testified that there was a "chance" or "possibility" that "intensive intervention over the course of several years" could allow D.R.J. to "unlearn some of his bad habits and learn to be a more productive and safer . . . member of society." As the trial court pointed out, however, Dr. Goldman could not say that it was "probable" that D.R.J.

nile is dangerous to the public and is not amenable to rehabilitation." *Commonwealth v. Droz*, 1996 WL 679669 at *3, 1996 Mass.Super. LEXIS 114, at *7 (Mass. Nov. 25, 1996). The statute placed the initial burden of production on both issues on the juvenile. In 1996, the statute was changed to require mandatory criminal prosecution of a juvenile between ages 14 and 17 charged with first or second degree murder. *See Commonwealth v. Hogan*, 426 Mass. 424, 688 N.E.2d 977, 980 n. 3 (1998).

6. Dr. Kinlan diagnosed D.R.J. with "Conduct Disorder, Severe," a basis for her conclusion that he would not be amenable to treatment within the time available to the juvenile system. The trial judge incorporated this diagnosis into his findings as to one of the § 16–2307(d) factors—"the child's mental condition." D.R.J. argues that this diagnosis was wrongly based in large part on the offenses he is alleged to have committed. But that reliance cannot be wrong when § 16–2307(e–1) requires the Family Division to assume, for transfer purposes, that the child committed the alleged act. And if a child committing such offenses can be so diagnosed, it cannot

be wrong for the trial court to rely on the diagnosis. If, at a later adjudication, it is determined that D.R.J. did not commit the offenses, then any error in relying on the assumption for transfer purposes will have been rectified.

Appellant also asserts that Dr. Kinlan's reliance on his failure to show remorse infringed on his privilege against self-incrimination. We need not explore this issue because Dr. Kinlan testified that, even if he had shown remorse, she would still have found that he was not amenable to treatment. Besides his lack of remorse, her conclusion rested on his pattern of disregarding others' rights, failure to conform to social norms, deceitfulness, reckless disregard for his safety and that of others, lack of attachment and empathy, asocial tendency, drug addiction, willingness to lie, and lack of "development of an appropriate conscious [*sic*] really of what we would call ego strength." Because she agreed that remorse alone would not have been enough to change her conclusion, and her opinion was only one of four by experts on which the trial judge relied, any reliance on D.R.J.'s lack of remorse played no perceptible role in the judge's decision.

"wouldn't be a danger to the community at twenty-one." D.R.J.'s other expert, a psychologist, testified that "if [D.R.J.] gets tried, he gets sentenced, does residential and really gets four years of intervention, I think there is some hope for him to change," but as the trial court found, this also did not go beyond a statement of possibility that D.R.J. could be made non-dangerous by treatment. In sum, against the assertions by the government's experts that treatment of D.R.J. within the juvenile system so as to eliminate, or even significantly reduce his risk for violence by age twenty-one would be impossible, appellant's physician experts could offer only pale assurances.

D.R.J. contends that the judge ignored other testimony that would have aided his case for rehabilitation. For example, Patricia Clark, a social worker and expert in the care and rehabilitation of juveniles, testified that she would "probably recommend" residential placement for "a case such as this." But she also acknowledged, that there are no appropriate residential placement facilities available to treat D.R.J. Her conclusion was confirmed by Dr. Nicholas Geleta, chief of the District of Columbia Residential Placement Unit and the Commission on Mental Health Services, and an expert in placement options for juveniles. He passed on information about D.R.J. to the only two placements he identified as appropriate for violent juvenile offenders, The Pines and Abraxas. Both rejected D.R.J. because of the "magnitude and aggressiveness" of the three separate charged offenses and the apparent lack of any mitigating emotional illnesses. We find no significant gaps in the trial judge's review and evaluation of the testimony.

Nor are we persuaded by appellant's argument that any need for transfer was brought about by the District's own failure to provide controlled facilities able to treat juveniles charged with serious offenses. The statute requires the trial judge to consider, among other things, "the techniques, facilities, and personnel for rehabilitation available to the [Family] Division ...." § 16–2307(e)(5). While the District's commitment to "a rehabilitative approach to juvenile justice" still favors treatment over punishment, that is so only if "'this disposition provides adequate protection for society.'" *In re L.J.*, 546 A.2d 429, 437 (D.C.1988) (quoting *Kent v. United States*, 130 U.S.App. D.C. 343, 346, 401 F.2d 408, 411 (1968) (emphasis omitted)). The conclusion the trial judge accepted was, not that no appropriate facilities are available to the District for violent juvenile offenders, but that D.R.J., who, as Dr. Geleta testified, "three separate and distinct times elected to utilize the most aggressive way you could to offend against another human being[,] ... display[s] a pattern" that makes *him* unsuitable for juvenile treatment. According to the expert testimony credited, no juvenile facility, not even a "therapeutic Oak Hill," could provide D.R.J. with the at-least ten years of treatment required to rehabilitate him and protect the community when, at the time of the hearing, only four years remained in which the court could detain him as a juvenile.[7]

Appellant's remaining challenges to the correctness of the judge's decision fall well short of persuading us that he abused his discretion, *J.L.M.*, 673 A.2d at 182, in ordering the transfer.

*Affirmed.*

---

7. The trial judge recognized the "system's" failure to intervene in the past to provide social services recommended for D.R.J. At the same time, D.R.J. had not responded well to such treatment as had been provided. Prior to these offenses, he had absconded from a youth shelter and failed to comply with drug testing requirements. While the judge did not condone the District's failure to act timely to help him in the past, he correctly realized that the statute did not require the District to make amends for that failure at the expense of the public safety.