**Tycho VENEY, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 93–CF–456.

District of Columbia Court of Appeals.

Argued Oct. 6, 1994.

Decided April 20, 1995.

Tana Lin, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on brief, for appellant.

Laura A. Cordero, Asst. U.S. Atty., with whom Eric H. Holder, Jr., U.S. Atty., and John R. Fisher, Elizabeth Trosman, and Karen E. Rhew, Asst. U.S. Attys., were on brief, for appellee.

Before FERREN, TERRY, and SCHWELB, Associate Judges.

PER CURIAM:

Following his guilty plea to manslaughter while armed, D.C.Code §§ 22–2401, –3202 (1989), Veney asked the court to sentence him pursuant to the provisions of the District of Columbia Youth Rehabilitation Act (DCYRA), D.C.Code § 24–801 *et seq.* (1989). The judge elected to sentence him as an adult. On appeal, Veney contends that the judge failed to make an explicit finding that Veney would not benefit from a DCYRA sentence. This court has recently held, however, that a "no-benefit" finding is not required by the DCYRA. *Peterson v. United States,* 657 A.2d 756, 763 (D.C.1995) (opinion of KING, J., joined by TERRY, J.) Accordingly, the judgment appealed from is hereby

*Affirmed.*

SCHWELB, Associate Judge, concurring.

I.

WHETHER A "NO BENEFIT" FINDING WAS REQUIRED

Because this court has now effectively, albeit somewhat cryptically, held that a "no benefit" finding is not required under the District of Columbia Youth Rehabilitation Act, D.C.Code § 24–801 *et seq.* (1989) (the DCYRA), *see Peterson v. United States,* 657 A.2d 756, 763 (D.C.1995) (two-judge concurring opinion), I have joined the per curiam opinion in this case. I note, however, that in *Veney,* and apparently in *Peterson,* the government made its argument on the unchallenged assumption that a "no benefit" finding *is* required under the DCYRA.

On a clean slate, I would be most reluctant to decide an issue which has neither been briefed nor argued. However compelling a theory may seem, I do not think the court should reach out to adopt it when it has not been presented to us in the normal course or subjected to the rigors of the adversarial process. We ought to resist the blandishments of the activist credo, which has been characterized as "Have Opinion, Need Case." *See In re Estate of Chuong,* 623 A.2d 1154, 1161 n. 1 (D.C.1993) (en banc) (concurring opinion) (quoting BERNARD E. WITKINS, MANUAL ON APPELLATE COURT OPINIONS § 85, at 155 (1977)). I would be more comfortable with *Peterson* as authority if the issue there

summarily decided had been contested by the parties.

At the same time, I cannot agree with Judge FERREN, see dissenting opinion, *post* at 631, that the question which he and Judge KING have been debating is settled by *[James] Smith v. United States*, 597 A.2d 377 (D.C.1991). In that case, the defendant had been placed on probation pursuant to the DCYRA, and had violated the conditions of his probation. To the extent that the question of the need for a "no benefit" finding can be found in that case at all,[1] it was in the context of a defendant who had already been found amenable to DCYRA treatment. If the *Smith* opinion, as its author now suggests, is construed as having decided that a "no benefit" finding is required where the defendant has not previously been sentenced under the DCYRA, *id.* at 382–83 n. 11, then the court undertook to address and decide an issue not before it. I therefore agree with Judge KING that the language in *Smith* purporting to require a "no benefit" finding in all DCYRA cases is not binding (but, on the contrary, is advisory only) when sought to be applied in *Peterson* and *Veney* to defendants who had never been found amenable to DCYRA sentencing. If there was "reaching out" in *Peterson* to decide the question one way, there was likewise "reaching out" in *Smith* to decide it the other way.

Under these circumstances, I believe that it may be appropriate for this court, upon a timely request, to consider, en banc, the "no benefit" issue as to which judges of this court disagree but which, so far, the parties have not debated at all. This would enable us to resolve conclusively the binding character, or lack thereof, of *Smith* and *Peterson,* and to provide definitive guidance to trial judges who may now be confused as to which of these cases they should follow.

In *Veney,* as I have mentioned, both sides assumed that a "no benefit" finding is required under the DCYRA. The only issue argued to us was whether the judge had made a sufficient finding. Because, in my view, affirmance is appropriate even upon that assumption, because the status of *Smith* and *Peterson* is a bit murky, and because I disagree most fundamentally with what Judge FERREN has written on that point, I now turn to the question that *was* presented to us for decision.

## II.

### WHETHER A "NO BENEFIT" FINDING WAS MADE

*A. The heart of the matter.*

The trial judge explicitly stated in open court that he had considered the option—for that is what it is—of sentencing appellant Tycho Barnardo Veney pursuant to the provisions of the DCYRA. Even under the regime of the former Federal Youth Corrections Act (FYCA), 18 U.S.C. § 5010, *et seq.* (now repealed), that is all that the judge was required to do. *Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974). Assuming, for the sake of argument, that he was obliged to articulate his finding in terms of personal benefit to Veney, the judge also explicitly did that. To be sure, the judge also considered the danger to the community which would be posed by a DCYRA sentence but, unlike Judge FERREN, I am satisfied that a sentencing judge may, and indeed should, do just that. Accordingly, quite aside from the issue decided in *Peterson,* there was no trial court error.

*B. The death of Marc Locust.*

The principal question posed by this case is one of law, but legal issues do not arise in a vacuum, and a few words are in order about the events which precipitated this appeal. Because the materials in the file are focused primarily on the mental and emotional problems of the defendant, we do not know very much about his victim. It appears from the government's sentencing memorandum,

---

1. In their briefs in *Smith,* the parties focused on whether an adult sentence upon revocation of probation was "more severe" than the defendant's initial imposition of probation under the DCYRA, and on whether the trial judge had abused her discretion in revoking probation. *Id.*

at 379.80. As in *Peterson,* the division in *Smith* ruled on an issue with respect to which the parties never crossed swords, and then phrased the ruling broadly enough to cover situations completely different from that presented in *Smith.*

however, that on February 28, 1992, Marc Locust was riding his bicycle to the Ivy Market, a local convenience store which he apparently frequented. Veney, who had purchased a revolver about four weeks earlier from a "junkie," was pacing back and forth at a corner near the market. As Locust approached the store, Veney pulled the revolver from his waistband, pointed it at Locust, and shot him in the chest from a distance of six feet. The bullet pierced Locust's heart and lungs.

Locust, who was unarmed, fell from the bicycle and tried to run away. Veney gave chase and fired again; a second bullet grazed Locust's forehead. Minutes later, Locust was found by his brother in a gutter, bleeding and gasping for breath. Marc Locust then died. He was twenty-one years old.

Veney was arrested and gave a videotaped statement to the police. He stated that he and Marc Locust had argued several summers earlier over a girl. He claimed that Locust had shot at him a few weeks before the killing, but he could not remember exactly where this occurred.[2] Veney admitted that he shot Locust, and that he ran home and hid the revolver. He later threw the weapon into the river.

Veney was charged with first degree murder while armed and with associated weapons offenses. In spite of the considerable evidence of premeditation, he was permitted to plead guilty to voluntary manslaughter while armed. Murder charges were dismissed as part of the plea agreement.

In advance of sentencing, Veney's counsel presented to the court evaluations of her client by two psychologists and one psychiatrist. It is apparent from these evaluations that Veney is at least moderately retarded[3] and that he suffers from various mental and emotional disorders. He was abused by both parents, and he was apparently present when his mother shot his father. Like his mother, Veney has on occasion attempted suicide.

There can be no doubt that he is a limited young man and that he grew up in most unfortunate circumstances.

The materials submitted by the defense also reveal, however, that Veney is an extremely dangerous individual. Since his teens, he has been engaged in numerous unlawful activities, including setting fires, cruelty to animals, stealing cars, destruction of property, fighting, and carrying a knife. He was committed to Saint Elizabeth Hospital and to the Receiving Home, and he spent two years at The Pines Treatment Center in Portsmouth, Virginia. He was released in June 1991. Then, according to the defense psychiatrist, Neil Blumberg, M.D., Veney

> returned to the District of Columbia and began associating with a delinquent crowd. He did not work, began drinking and abusing drugs, and eventually became involved in selling drugs, which became his primary means of support.

Veney's chosen lifestyle is especially dangerous, both for him and for others because, in the words of defense psychologist Lanning E. Moldauer, Ph.D.,

> Mr. Veney is particularly poorly equipped for the role of drug dealer or street "hustler" where the action is likely to turn violent and the demands for making quick, accurate distinctions in life-and-death situations are all too great.

Veney, according to Dr. Moldauer, is "abnormally hypervigilant and unrealistically fearful." This is a trait which may well have led to the death of Marc Locust.

The prosecutor and defense counsel prepared separate thoughtful submissions to the sentencing judge. At the sentencing hearing, the prosecutor remarked, *inter alia*, that

> [t]here has been a lot of discussion about what would help Mr. Veney. I think the time has come to put the needs of the community ahead of those of Mr. Veney.[4]

---

2. The prosecutor represented that, if the case had gone to trial, government witnesses would have testified that Veney had fired at Locust a week or so before Locust's death, but had missed.

3. When tested, Veney did not know the number of months in the year, believed that 10 minus 6 equals 7, and was unable to explain the word "repair."

4. *There was no objection to this argument.* Under the doctrine now expounded by Judge FER-

The judge declined to sentence Veney pursuant to the DCYRA, and ordered him incarcerated for a period of fifteen years to life. This appeal followed.

### C. The DCYRA, the FYCA, and Dorszynski revisited.

The DCYRA provides that if the court shall find the defendant eligible by age and offense [5] for sentencing as a youth offender, it "may sentence [him] for treatment and supervision" pursuant to the Act. D.C.Code § 24–803(b) (1989). If the court finds that the youth offender "will derive benefit from the provisions of this chapter, the court shall make a statement on the record of the reasons for its determination." *Id.* § 24–803(c). The Act goes on to state that

> [i]f the court shall find that the youth offender will not derive benefit from treatment under subsection (b) of this section, then the court may sentence the youth offender under any other applicable penalty provision.

*Id.* § 24–803(d). A statement of reasons is thus explicitly required when a DCYRA sentence is imposed, but there is no comparable requirement that the judge explain his reasons for imposing an adult sentence. Finally, § 24–803(f) provides that the sentencing alternatives provided by sub-sections (a) through (e) are "in addition to the options already available to the court."

At first blush, there appears to be some tension between the various sub-sections of § 24–803. Section 24–803(b) states that the court "may" sentence an eligible offender pursuant to the Act, not that the court "shall" do so. Section 24–803(d), on the other hand, authorizes imposition of an adult sentence "if"—and thus arguably *only* "if"—the court finds no benefit. But Section 24–803(f) provides in effect that the sentences available to the judge prior to the passage of the Act remain available—a provision which makes sense only if the judge retains the option to impose an adult sentence on any offender.

Veney's argument proceeds from the assumption that if an age-and offense-eligible defendant's prospects of rehabilitation would be enhanced by DCYRA sentencing, then the judge *must* sentence the offender pursuant to that statute and *may not* impose an adult sentence, regardless of the potential competing interest of the community. Agreeing with Veney, Judge FERREN characterizes "amenability to treatment leading to rehabilitation" as the "controlling factor."

Even if we were writing on a clean slate, this interpretation would be difficult to reconcile with the language of the statute as a whole, and especially with § 24–803(f). Moreover, it runs counter to the trial judge's traditionally broad discretion in the imposition of sentence. *See, e.g., In re L.J.*, 546 A.2d 429, 434 (D.C.1988).[6] In any event, Veney's approach and Judge FERREN's dissenting opinion cannot, in my view, be reconciled with the Supreme Court's decision in *Dorszynski.*[7]

REN, however, the prosecutor's comment was irrelevant and, presumably, subject to a motion to strike.

5. Unlike the FYCA, the DCYRA is not available to defendants convicted of murder. *See* D.C.Code § 24–801(6) (1989).

6. In the act of sentencing, the judge approaches the attribute of the Almighty—he sits in judgment of his fellow man.... To sit in judgment of a man while looking him in the eye and knowing him in some way first hand is one thing, but to do so only by way of the dispassionate and remote confines of an appellate record, no matter how elaborately composed, is quite another.

*L.J., supra*, 546 A.2d at 434 (footnote omitted) (quoting *Foster v. United States*, 290 A.2d 176, 178–79 (D.C.1972)).

7. As this court recognized in *(James) Smith, supra*, 597 A.2d at 382 & n. 11, the Council of the District of Columbia was well aware, in enacting the DCYRA, of the Supreme Court's interpretation in *Dorszynski* of the Federal Youth Corrections Act (FYCA), which the DCYRA was enacted to replace. Indeed, the DCYRA, unlike the FYCA, does not "tilt" towards sentencing as a "youth offender." The FYCA contained a presumption, not retained by the DCYRA, that age-eligible offenders would be sentenced to treatment under the FYCA; under the DCYRA, on the other hand, the judge must provide a statement of reasons before sentencing a defendant pursuant to its provisions. *See* § 24–803(c). The FYCA also permitted "youth offender" sentencing for murder, *see Tribble v. United States*, 447 A.2d 766, 774 (D.C.1982), whereas the DCYRA does not.

The Supreme Court held unequivocally in *Dorszynski* that

> [t]he authority to sentence a youth offender under "any other applicable penalty provision" is expressly reserved to federal trial courts by [18 U.S.C.] § 5010(d), and thus is within the permissible range of sentences which may be imposed under the Act. *The "no benefit" finding required by the Act is not to be read as a substantive standard which must be satisfied to support a sentence outside the Act,* for such a reading would subject the sentence to appellate review even though the sentence was permitted by the Act's terms, thereby limiting the sentencing court's discretion. We will not assume Congress to have intended such a departure from well-established doctrine without a clear expression to disavow it. As our review has shown, the exclusive sentencing power of district judges was acknowledged, and Congress' intention to affirm that power was clearly indicated.

418 U.S. at 441, 94 S.Ct. at 3051 (emphasis added). Indeed, "the [FYCA] was intended to increase the sentencing options of federal trial judges, *rather than to limit the exercise of their discretion whether to employ the newly created options.*" *Id.* at 440, 94 S.Ct. at 3051 (emphasis added); *see also Tribble, supra* note 7, 447 A.2d at 774. Accordingly, "[o]nce it is made clear that the sentencing judge has considered the option of treatment under the Act and rejected it, however, no appellate review is warranted." *Dorszynski,* 418 U.S. at 443, 94 S.Ct. at 3052; *Tribble,* 447 A.2d at 774. It is undisputed that, in this case, the trial judge considered—and rejected—the option of sentencing Veney pursuant to the DCYRA.

Later in the *Dorszynski* opinion, the Court stated that

> [l]iteral compliance with the Act can be satisfied by any expression that makes clear the sentencing judge considered the alternative of sentencing under the Act *and decided that the youth offender would not derive benefit from treatment under the Act.*

418 U.S. at 444, 94 S.Ct. at 3053 (emphasis added). Given Chief Justice Burger's repeated allusions to the optional character of FYCA sentencing, however, the Court obviously did not contemplate in the italicized language that statements by the trial judge to the effect that he or she elected not to exercise that option were to be rigorously parsed, as Veney now seeks to parse them, in order to assure that sufficient or even exclusive weight was being accorded to the defendant's personal benefit. "Appellate courts should not be subject to the burden of case-by-case examination of the record to make sure that the sentencing judge considered the treatment option made available by the Act." *Id.*

Moreover, in the present case, the judge made an explicit defendant-oriented finding. At the sentencing hearing, the prosecutor stated that she had explored the availability of psychiatric counselling at Lorton and at the Youth Center, and that "I have not seen anything that would indicate that he will receive better treatment at the Youth Center ... than at Lorton." Veney's attorney took the position that

> [t]he Youth Center is not ideal. It does not have everything that will help and treat Mr. Veney, but it's certainly better and it certainly has more than what regular Lorton, adult Lorton, has.

The judge expressly addressed the issue whether the Youth Center would provide Veney with rehabilitative treatment superior to that at Lorton:

> A Youth Act sentence is inappropriate. I'm satisfied that your treatment as an adult will be just as good as it would be as a youth.

Given the context of the lawyers' arguments, the judge's reference to "your treatment" plainly referred to rehabilitative opportunities. If adult facilities were "just as good" as those at the Youth Center, then Veney failed to show that DCYRA sentencing would provide him with any benefit from a rehabilitational perspective.

The judge was also obviously of the opinion that the safety of the community, as well as the nature of Veney's crime, called for severe punishment. He noted that if he sentenced Veney pursuant to the DCYRA, he

would have "absolutely no control over the ultimate decision those folks would make when to release you." His concerns were among those which have traditionally been invoked in the sentencing process. *See, e.g., Wasman v. United States,* 468 U.S. 559, 563–64, 104 S.Ct. 3217, 3220, 82 L.Ed.2d 424 (1984); *Williams v. New York,* 337 U.S. 241, 246–47, 69 S.Ct. 1079, 1082–83, 93 L.Ed. 1337 (1949); *Butler v. United States,* 379 A.2d 948, 950 (D.C.1977). Judge FERREN insists, however, that these authorities are not decisive here because, in his view, the decision whether to impose a DCYRA sentence turns exclusively on the question of rehabilitative benefit to the defendant. It is to that theory I now turn.

## D. Response to the dissent.

According to Judge FERREN, the DCYRA authorizes consideration of harm to the community only to the extent that, if an offender is rehabilitated, the community will benefit because, presumably, the offender will be unlikely or less likely to break the law again. Judge FERREN insists that, under the DCYRA, "*the sentencing judge [may not] engage in a discretionary weighing of potential benefits to the offender from YRA treatment against the potential harm to the community from such treatment.*" (Emphasis added).[8] Any consideration of the community's interest, or any weighing of that interest against the defendant's prospects for rehabilitation, is said to be forbidden by the statutory language, and thus taboo.

It may be useful to consider this question from the perspective of a legislator in the District of Columbia or, for that matter, anywhere else in this country. Can one imagine an elected official who would say, publicly, that a sentencing decision in any criminal case, but especially in an armed homicide case, must be made with only one goal in mind—the potential rehabilitation of the defendant—and that considerations of public safety, incapacitation, deterrence and punishment are irrelevant? I suggest that a politician who made such a statement would promptly become an ex-politician. Judges are not supposed to wear blinders when they go on the bench, *cf. Poulnot v. District of Columbia,* 608 A.2d 134, 141–42 (D.C.1992), and I think it is fair to say that any official who might have to run for re-election would take considerable pains to avoid association in the public mind with such a viewpoint. The DCYRA was enacted in 1985 by practicing politicians, and it is hard to believe that they meant what Judge FERREN says they meant. Nor is this solely a matter of political advantage; most reasonable people would perceive such a one-dimensional focus on the interests of the offender (to the exclusion of the victim and his family and the law-abiding citizens of the community) to be unwise, unfair and morally questionable.

As Judge FERREN acknowledges, the purpose of the DCYRA, as stated in the Judiciary Committee Report, was

> to provide rehabilitation opportunities for *deserving* youth adult offenders between the ages of 18 and 22 while incarcerated, and at the same time [to] *fully protect the public safety by enabling the court to impose a maximum penalty where warranted.*

COUNCIL OF THE DISTRICT OF COLUMBIA COMMITTEE ON THE JUDICIARY, REPORT ON BILL 6–47, YOUTH REHABILITATION ACT OF 1985 (COMMITTEE REPORT) 2 (1985) (emphasis added). The emphasized language belies any notion that the legislature was concerned solely with rehabilitative opportunities for young criminals. On the contrary, the imposition of maximum penalties, where necessary, was an option upon which the Council focused in enacting this very legislation. The use of the word "deserving" is also significant, for if the court views the defendant as "undeserving" (*e.g.,* because the crime was too severe), then, according to the Report, DCYRA sentencing is not called for.

Moreover, it is not subject to dispute that incapacitation of the offender and the prevention, deterrence, and punishment of crime have traditionally been appropriate considerations in the sentencing calculus. In *Dorsz-*

---

**8.** I have italicized Judge FERREN's own language in response to the gentle chiding in footnote 13 of his opinion. Perhaps the italics may persuade

my colleague (or other readers) that my perception is not quite as inaccurate as that footnote suggests.

*ynski,* as we have seen, the Supreme Court declined to infer an intention on the part of Congress to restrict the sentencing judge's traditional discretion, and it explicitly held that the "no benefit" requirement did not establish a new or "substantive" standard. 418 U.S. at 441, 94 S.Ct. at 3051. Judge FERREN, however, treats the "no benefit" language as creating not only a substantive standard, but a controlling one. I think my colleague thus reads the DCYRA, contrary to *Dorszynski's* construction of the FYCA, as restricting the sentencing judge's discretion rather than as providing the judge with additional sentencing options.

In any event, Judge FERREN's assertion that, under the DCYRA, the sentencing judge may not weigh harm to the community against rehabilitational benefit to the defendant is strikingly at odds with his own opinion for the court in *[James] Smith.* In that case, Smith had complained that the sentencing judge had abused her discretion in revoking his DCYRA probation, and that she had failed to find a proper balance between the community's interest and his own. In rejecting that contention, Judge FERREN wrote, citing prior cases, that

> the trial court need not expressly state on the record *how it balances the competing interests of the community with the rehabilitative goals of probation.*

597 A.2d at 383 (emphasis added; citations omitted). The clear import of the italicized words is that the judge is supposed to balance the community's interest in public safety against the interest of the offender in rehabilitation, but need not explain how he did so. The probation at issue in *Smith* was

Youth Act probation, so that the balancing process described in the court's opinion was unequivocally viewed as applicable to the DCYRA.[9]

To be sure, this particular issue was not contested in *Smith.* The defendant in that case took the position that, even in a DCYRA probation case, the safety of the community must be considered. As we recently pointed out in *Murphy v. McCloud,* 650 A.2d 202 (D.C.1994), "[a] point of law merely assumed in an opinion, not discussed, is not authoritative." *Id.* at 205 (quoting *In re Stegall,* 865 F.2d 140, 142 (7th Cir.1989)). Nevertheless, it is fair to say that if a proscription against considering public safety lurks somewhere in the bosom of the DCYRA, the court in *Smith* failed to discern its existence. If the statute contained such an extraordinary feature, surely somebody would have noticed it before this appeal.

I am unable to reconcile with reality or with just plain common sense the notion that in 1985—a time of referendum-approved mandatory minimum sentences and a staggering homicide rate in our capital[10]—a group of legislators enacted a law requiring the judge, even in an armed homicide case, to consider only the defendant's long-term prospects for rehabilitation and to ignore the community's immediate interest in public safety. Accordingly, I must respectfully but emphatically disagree with Judge FERREN's most recent reading of the DCYRA. I would vote to affirm the judgment even if *Peterson* had not been decided.[11]

FERREN, Associate Judge, dissenting:

This decision and the one issued several days before it, *Peterson v. United States,* 657

---

9. In footnote 12 to his opinion, Judge FERREN says that, according to *[James] Smith,* the judge may take the safety of the community into consideration in deciding whether to revoke probation, but that if he does revoke, he must then remove this factor from the calculus in selecting the defendant's punishment. To state that proposition is to refute it.

10. The DCYRA was enacted less than three years after the citizens of this jurisdiction voted overwhelmingly for mandatory minimum sentences for armed offenses (as well as for certain other crimes). That legislation was precipitated in part, by the devastation wrought by firearms. In 1979, the number of Americans killed by hand-

guns was more than forty times as great as the number of persons killed by such weapons in Canada, Israel, West Germany, Japan, Switzerland, Sweden and Great Britain combined. *See Lemon v. United States,* 564 A.2d 1368, 1379 (D.C.1989). Veney shot Marc Locust to death with a handgun.

11. Veney also claims that the judge's finding that he would receive treatment as an adult just as favorable as the treatment he would receive at the Youth Center "was not supported by any facts established in the record." This is precisely the type of inquiry which appellate courts are not required to make. *Dorszynski,* 418 U.S. at 444, 94 S.Ct. at 3053; *Tribble,* 447 A.2d at 774.

A.2d 756 (D.C.1995), reflect a remarkable result. Two divisions of this court decide the same issue—holding that a sentencing judge can lawfully deny Youth Rehabilitation Act (YRA) treatment to an eligible youth offender without need for an explicit finding that the youth "will not derive benefit" from such treatment—even though that issue has not been raised or briefed or orally argued on appeal by any party in either case. (Indeed, the court put *Peterson* on the summary calendar without oral argument.)

Appellants in both cases have contended, rather, that in imposing adult sentences on youth offenders the trial court did not make a required "no benefit" finding. The government in both cases has replied—without contesting appellants' premise of a required explicit finding—that the court, in fact, had found "no benefit." In short, all parties, including the government, implicitly have agreed for purposes of *Peterson* and *Veney*— or at least have not disagreed—that before denying a YRA sentence requested by an eligible offender, the trial judge must make an explicit finding that a YRA sentence will not benefit the defendant. *See (James) Smith v. United States*, 597 A.2d 377, 383

(D.C.1991) ("because appellant was a youth offender, § 24–803(d) required the trial court to make an explicit finding on the record that appellant would 'not derive benefit from' continued YRA treatment before the court could lawfully impose an adult sentence").[1] The only question presented in either case, therefore, was whether the sentencing judge's finding was "explicit" enough to constitute a finding of "no benefit."

More specifically, according to the parties, only one legal issue and one factual issue are presented: What exactly is an "explicit" finding of "no benefit" within the meaning of § 24–803(d)? Did the sentencing judge, in denying YRA treatment, make such an explicit finding? Nonetheless, two of my colleagues, joining in a two-paragraph concurring opinion by Judge KING in *Peterson*—and eschewing any analysis of applicable case law or any reference to legislative history—have reached out to answer a very significant question without offering the parties the traditional opportunity to file supplemental briefs on an issue the court has decided to reach *sua sponte*.[2] This unprecedented action is especially unfair in light of the fact

---

1. On page 31 of its appellate brief in *Peterson*, the government summarized its position as follows:

   In sum, this Court should affirm the sentencing court's sentence because the record demonstrates that the trial court explicitly considered the options available under the YRA and concluded that appellant Peterson would not derive a benefit by being sentenced thereunder.

   This court clearly understood and acknowledged that this was the government's only position, *i.e.*, that the government did *not* attack the underlying premise that a "no benefit" finding was required before denying YRA treatment to eligible youth offenders. *See Peterson*, 657 A.2d at 763. Similarly, in *Veney*, the government acknowledged in its brief (pages 8 and 9):

   [T]his court held in *Smith* that the trial court was required to make an explicit "no benefit" finding before imposing an adult sentence in order to insure that the trial court had in fact exercised its discretion in rejecting a Youth Act sentence. *Id.* at 382.... In the instant case, it is simply indisputable that the trial court exercised its discretion in refusing to impose a Youth Act sentence when it explicitly stated that a Youth Act sentence would be "inappropriate" in this case.

2. The *Veney* case was argued on October 6, 1994; *Peterson* was submitted on summary calendar,

without oral argument, two weeks earlier on September 22, 1994. The two divisions, therefore, were seized of the same issue at the same time. Because a majority in one division decided to announce new law that would affect the other case, I believe both divisions should have been merged for purposes of deciding the common issue and published their decisions simultaneously, rather than deciding the cases sequentially. After all, both divisions obviously were aware of both cases. *See* DISTRICT OF COLUMBIA COURTS INTERNAL OPERATING PROCEDURES VIII. G. (referring to circulation of division opinion to full court for "five (5) working days to consider the draft opinion before it is sent to the printer"). One division of the court should not race another division to the printer to dictate the other division's result. The *Veney* division, however, is now bound by *Peterson, see M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971), even though we should have had an equal opportunity to opine on the issue. Therefore, although I should technically "concur" in light of the binding authority of *Peterson*, I feel permitted under the circumstances to "dissent" from *Veney/Peterson* and accordingly do so. Because of the importance of the "no benefit" issue decided in *Peterson*, as well as the unusual situation presented by these two cases, I agree with Judge Schwelb that this court should reconsider the YRA "no benefit" issue en banc.

that appellants, as well as the government, had every reason to believe that this court understands—and indeed has held—that the YRA requires an explicit "no benefit" finding before denying YRA treatment. *See (James) Smith,* 597 A.2d at 382 n. 11; *supra* note 1.[3]

I therefore believe that both the *Veney* and the *Peterson* divisions are bound to follow *(James) Smith's* conclusion that an explicit "no benefit" finding is required, see *supra* note 3, unless and until that broad holding is overruled by the en banc court. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.

1971).[4] Having failed to persuade my colleagues of that fundamental limitation here, I shall discuss, first, why—as *(James) Smith* holds—the YRA requires an explicit "no benefit" finding every time a trial judge denies an eligible youth offender's request for YRA treatment. I will then explain why appellant Veney is entitled to resentencing based on the trial judge's failure to make the required "no benefit" finding in this case.

## I.

In order to show why both the *Veney* and *Peterson* divisions are bound by our decision

3. In *(James) Smith* we held that, in revoking a YRA sentence of probation, the trial court could impose an adult sentence, but only after explicitly making a finding that the appellant "would 'not derive benefit from' continued YRA treatment." 597 A.2d at 383. Perhaps reasonable persons can differ as to whether our *(James) Smith* ruling can be confined to probation revocation cases (I believe it cannot; the court wrote more broadly than that). In any event, this court's language was unlimited; we concluded that, just like the repealed Federal Youth Corrections Act (FYCA), 18 U.S.C. §§ 5005 *et seq.* (1988), the YRA requires a "no benefit" finding in every case when the court decides to withhold YRA treatment from an eligible youth offender. Without limiting our decision to probation revocations, we said unequivocally—after discussing legislative history, including the Council of the District of Columbia's awareness of the Supreme Court's interpretation of the analogous FYCA in *Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974)—that "[g]iven the Council's choice of statutory language in D.C.Code § 24–803(d) and the known *Dorszynski* gloss on that language, we must conclude that the Council intended the trial court to make an express 'no benefit' finding when denying YRA treatment to a youth offender." *(James) Smith,* 597 A.2d at 383 n. 11.

4. Judge Schwelb, *see ante* at 3 n. 1, and Judge King in *Peterson, see* 657 A.2d at 764 n. 1, suggest that the "no benefit" issue was not presented in *(James) Smith.* That is not correct. The principal question presented in that case—to quote appellant's opening brief (p.4)—was "[w]hether [the] trial court's imposition of adult sentence upon revocation of probation originally ordered under the Youth Rehabilitation Act of 1985 is legal under D.C.Code § 24–104" (captioned "Discharge from or continuance of probation; modification or revocation of order"). Necessarily the answer required consideration of the YRA itself. Appellant, therefore, cited YRA legislative history and several cases from this jurisdiction interpreting the FYCA, see *supra* note 3: *Moore v. United States,* 468 A.2d 1331 (D.C.

1983); *Cole v. United States,* 384 A.2d 651 (D.C. 1978); *Tatum v. United States,* 114 U.S.App.D.C. 49, 310 F.2d 854 (1962). From these authorities he argued that imposition of an adult sentence was more severe than a Youth Act sentence and thus, according to *Mulky v. United States,* 451 A.2d 855 (D.C.1982), could not be imposed upon revocation of YRA probation pursuant to § 24–104. We rejected that argument on the ground that, even if an adult sentence were more severe than a Youth Act sentence, the plain language of § 24–104 permits imposition of any sentence, including a more severe one, that originally might have been imposed. *See (James) Smith,* 597 A.2d at 380. The appellant argued in the alternative, however, that even if § 24–104 permitted imposition of a more severe sentence upon revocation of YRA probation, the YRA itself did not "allow[ ] the trial court to rescind the youth offender status of a defendant who is placed on probation." Appellant's Reply Brief at 5. *See (James) Smith,* 597 A.2d at 380. Appellant therefore took the position that such "nullification of the trial court's original determination that defendant would benefit from the provisions of the YRA" would be "completely at odds with the purpose and effect of the YRA." Appellant's Reply Brief at 5. We concluded that appellant was partly right and partly wrong: the sentencing court could nullify the original finding that appellant would benefit from YRA treatment, but only upon an explicit finding that, upon revocation of probation, appellant no longer would benefit from such treatment—a ruling dictated by the Supreme Court in *Ralston v. Robinson,* 454 U.S. 201, 219, 102 S.Ct. 233, 244, 70 L.Ed.2d 345 (1981) (applying *Dorszynski* FYCA analysis), *cited in (James) Smith,* 597 A.2d at 382. There is no way that this court, with any integrity, could have rejected appellant Smith's argument without giving the proverbial "half loaf"—the right to the sentencing court's explicit "benefit" or "no benefit" finding—that *Ralston* unquestionably mandated. Moreover, because *Ralston* merely applied *Dorszynski's* basic "no benefit" analysis, there was no discernible principle that limited the ruling to the probation revocation context.

in *(James) Smith,* I essentially summarize in this part of the opinion the *(James) Smith* analysis, initially demonstrating what this court already has held and then outlining several reasons why the court's presentation in *Peterson,* in derogation of *(James) Smith,* falls short. Thereafter, in Part II. of the opinion, I discuss in greater depth the Supreme Court's decision in *Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974), analyzing the now-repealed Federal Youth Corrections Act on which our local YRA is based, in order to show why Judge KING's simple textual interpretation, assertedly based on "unambiguous language of the statute," *Peterson,* 657 A.2d at 763, is clearly untenable.

### A.

I begin by quoting in full the relevant provisions of the YRA, D.C.Code § 24–803 (1989), listing the trial court's YRA sentencing alternatives:

(a) [provisions concerning probation]

(b) If the court shall find that a convicted person is a youth offender, and the offense is punishable by imprisonment under applicable provisions of law other than this subsection, the court may sentence the youth offender for treatment and supervision pursuant to this chapter up to the maximum penalty of imprisonment otherwise provided by law. The youth offender shall serve the sentence of the court unless sooner released as provided in § 24–804.

(c) Where the court finds that a person is a youth offender and determines that *the youth offender will derive benefit from the provisions of this chapter, the court shall make a statement on the record of the reasons for its determination.* The youth offender shall be entitled to present to the court facts that would affect the decision of the court to sentence the youth offender pursuant to the provisions of this chapter.

(d) If the court shall find that *the youth offender will not derive benefit from treatment under subsection (b) of this section,* then the court may sentence the youth offender under any other applicable penalty provision.

(e) If the court desires additional information as to whether a youth offender will derive benefit from treatment under subsection (b) of this section, the court may order that the youth offender be committed for observation and study at an appropriate classification center or agency. Within 60 days from the date of the order or an additional period that the court may grant, the court shall receive the report.

(f) Subsections (a) through (e) of this section provide sentencing alternatives in addition to the options already available to the court.

(Emphasis added.)

Without doubt, under both subsection (c) ("will derive benefit") and subsection (d) ("will not derive benefit") the trial court makes a finding. It is clear, moreover, that under subsection (c) that finding must be explicit *and* detailed; the court has to "make a statement on the record of the reasons for its determination." D.C.Code § 24–803(c). The question presented here is whether § 24–803(d) requires the sentencing judge, in denying YRA treatment to an eligible youth offender, to make an explicit finding that "the youth offender will not derive benefit from treatment under subsection (b)"—in short, to make an explicit "no benefit" finding—when no statement of reasons for denial is required.

Even though the words "explicit finding" or "express finding" do not appear in the statute, and even though subsection (d)—unlike subsection (c)—does not require a "statement on the record of the reasons for its determination," the "no benefit" issue arises because the Supreme Court concluded that an explicit finding of "no benefit" was required under the YRA's federal statutory predecessor, the Federal Youth Corrections Act (FYCA), even though no statutory language called for an explicit finding. *See Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974). As we pointed out in *(James) Smith:*

Under the now-repealed Federal Youth Corrections Act (FYCA), 18 U.S.C. § 5010(d) (1982), ... we held, following the Supreme Court, that "an express finding of no benefit must be made on the record."

*(Curtis) Smith v. United States,* 330 A.2d 519, 522 (D.C.1974) (emphasis in original) (quoting *Dorszynski v. United States,* 418 U.S. 424, 425, 94 S.Ct. 3042, 3044, 41 L.Ed.2d 855 (1974)).

597 A.2d at 381–82 (footnotes omitted). We then added:

> The Supreme Court has reasoned that an explicit, not implicit, finding of no benefit "insure[s] that the sentencing judge exercised his [or her] discretion in choosing not to commit a youth offender to treatment under the Act." *Dorszynski,* 418 U.S. at 443, 94 S.Ct. at 3052–53. "To hold that a 'no benefit' finding is implicit each time a sentence under the Act is not chosen would render [18 U.S.C.] § 5010(d) nugatory...." *Id.* at 444, 94 S.Ct. at 3053.

597 A.2d at 382. We next noted in language applicable to appellant Veney (as well as to appellant Peterson):

> The language of D.C.Code § 24–803(d) at issue here is virtually identical to 18 U.S.C. § 5010(d) at issue in *Dorszynski,*[5] and none of the legislative history of the YRA (or of § 24–803(d) in particular) indicates a desire to depart from the well-established interpretation *Dorszynski* put on that language. We therefore see no reason why we should not apply to YRA § 24–803(d) our FYCA reasoning, *see (Curtis) Smith,* 330 A.2d at 522, derived from the Supreme Court's *Dorszynski* ruling and thus require the trial court to make an explicit "no benefit" finding, although the court need not supply supporting reasons.

*Id.* (footnote omitted).

In the footnote to the immediately preceding quotation from *(James) Smith,* we cited legislative history, noting that "some of the persons who testified before the Council mentioned the *Dorszynski* case," *id.* n. 11, and that the report of the Council Committee on the Judiciary itself indicated the need for a "no benefit" finding if the judge decided to impose an adult sentence. According to the Committee Report:

> The judge can sentence youth offenders differently from adult offenders (over 21 years old) if the judge finds that they would benefit from Youth Act treatment, in which case the judge must state on the record the reasons for his or her determination. In this instance, the prosecutor may argue against such treatment. *The judge may also impose an adult sentence if he or she finds that there will be no benefit.* The judge makes a decision on the basis of detailed information concerning the youth offender provided by disinterested third parties.

COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 6–47, YOUTH REHABILITATION ACT OF 1985 (Committee Report) 3 (1985) (emphasis added), *quoted in (James) Smith,* 597 A.2d at 382 n. 11. In sum, the Council recognized that the trial judge must "find" a "benefit" or "no benefit" from YRA sentencing in each case; and, as we said in *(James) Smith,* under a time-honored rule of statutory construction that finding, either way, must be explicit since the Council, in adopting the YRA, must be said to have incorporated *Dorszynski's* interpretative gloss.

> "Ordinarily, Congress may be presumed to know the construction which has been given to prior statutory provisions, and to know their history, when it incorporates them into later legislation." *Office of People's Counsel v. Public Service Comm'n,* 477 A.2d 1079, 1091 (D.C.1984). The same reasoning applies to the Council of the District of Columbia.

*(James) Smith,* 597 A.2d at 382 n. 11. *See Hughes v. District of Columbia Dep't. of Employment Servs.,* 498 A.2d 567, 571 n. 8 (D.C.1985) ("When a local provision is bor-

---

**5.** 18 U.S.C. § 5010(d) (1982) provided:

> (d) If the court shall find that the youth offender will not derive benefit from treatment under subsection (b) or (c), then the court may sentence the youth offender under any other applicable penalty provisions.

D.C.Code § 24–803(d) provides:

> (d) If the court finds that the youth offender will not derive benefit from treatment under subsection (b) of this section, then the court may sentence the youth offender under any other applicable penalty provision.

According to *(James) Smith,* 597 A.2d at 382 n. 10, "[t]he only difference between the two subsections is that the federal act mentions subsections (b) and (c), whereas our local act mentions only subsection (b). That difference is not relevant to our discussion here."

rowed directly from a federal statute, the Council is presumed to have borrowed the judicial construction thereof as well.") (citing *Whitt v. District of Columbia,* 413 A.2d 1301, 1303–04 (D.C.1980)); *see also Lenaerts v. District of Columbia Dep't of Employment Servs.,* 545 A.2d 1234, 1237, 1238 (D.C.1988) ("where a legislature of a state adopts a statutory provision which is modeled after a federal statute or the statute of another state, it is presumed to adopt prior constructions of the statute in the jurisdiction in which it originated," provided "the judicial interpretation of the existing law is firm") (citing 2A SUTHERLAND STATUTORY CONSTRUCTION § 52.02 (N. Singer 4th ed. 1984)). Little wonder, then, that the government never suggested in *Veney* or in *Peterson* that the YRA did not require the sentencing judge to make an explicit "no benefit" finding. See *supra* note 1.

As all judges and lawyers know, some judicial decisions reflect broad holdings; other holdings are narrower. In *(James) Smith,* we concluded on the basis of case law, legislative history, and rules of statutory construction that an explicit "no benefit" finding is required whenever a sentencing judge denies YRA treatment to a youth offender; there was no discernible statutory basis for saying that an explicit finding was required in some contexts but not in others. We applied that construction to a case concerning YRA probation revocation. Because we did not present an analysis limited to a revocation situation, it cannot reasonably be said that the scope of our holding—the announced rule of the case—was so limited. I believe

my colleagues in *Peterson* seriously err in refusing to follow *(James) Smith* as a decision that binds the court in the *Peterson* and *Veney* cases. *See M.A.P. v. Ryan,* 285 A.2d at 312.

**B.**

The division majority in *Peterson,* essentially ignoring *(James) Smith,* apparently inferred that, in adopting the YRA, the Council rejected *Dorszynski's* requirement of an explicit "no benefit" finding because the Council added to the YRA a requirement not found in the FYCA: if the judge decides to grant YRA treatment, the judge must expressly state why. *See* D.C.Code § 24–803(c). From this departure from the FYCA my colleagues apparently surmised that the Council, although aware of *Dorszynski* and other FYCA judicial interpretations, must not have cared whether a judge who denies YRA treatment expressly finds no benefit, and thus the Council implicitly must have rejected such a requirement by not expressly providing for it. I entirely disagree. The fact that the Council wanted to put the burden on the defendant to demonstrate likely benefit from YRA treatment, supported by a trial court "statement of reasons" to that effect on the record, does not at all mean that the Council desired to eliminate the traditional *Dorszynski* requirement that, when denying such treatment, the judge at least must explicitly find no benefit (without having to provide supporting reasons). *See (James) Smith,* 597 A.2d at 382 & n. 11.[6]

---

6. As we said in *(James) Smith:*

It is true that the YRA worked a major change in sections (b) and (c) of the sentencing alternatives provisions of the FYCA. Under the FYCA, a sentencing judge could grant FYCA treatment without providing an explanation but could reject FYCA treatment only after indicating on the record that he or she had "considered the option of treatment under the Act and rejected it." *Dorszynski,* 418 U.S. at 443, 94 S.Ct. at 3053. The judge could reject FYCA treatment only by explicitly making a finding of "no benefit," although no accompanying reasons were required. *Id.* at 442–44, 94 S.Ct. at 3052–53. In practical effect, therefore, FYCA treatment was presumptively required for eligible offenders, subject to change through a finding of "no benefit." In contrast, YRA treatment is not available unless the judge

makes "a statement on the record of the reasons" why "the youth offender will derive benefit." D.C.Code § 24–803(d). The Council wanted, in effect, to place a burden on the offender to show he or she would derive benefit, not a burden on the government to convince the court there would be no benefit. *See* COUNCIL OF THE DISTRICT OF COLUMBIA, FIRST READING ON PROPOSED BILL No. 6–47, Youth Rehabilitation Act of 1985, at 46–49 (June 25, 1985) (remarks of Council members Rolark, Clarke, and Ray). But this new trial court responsibility to express reasons for a finding of YRA benefit does not, on its face, obviate the need for the court expressly to find "no benefit," without supporting reasons, when denying YRA treatment. Given the Council's choice of statutory language in D.C.Code § 24–803(d) and the known *Dorszynski* gloss on that lan-

There are three reasons why I believe my colleagues in the majority in *Peterson* (and thus in *Veney*) are wrong. I will summarize them here and develop them more fully in Part II. First, the statutory provisions Judge KING calls "unambiguous language," *Peterson,* 657 A.2d at 763, do not unambiguously rule out an explicit "no benefit" finding. To the contrary, both § 24–803(c) ("where the court finds ... and determines") and § 24–803(d) ("if the court shall find") expressly refer to court findings. Significantly, the legislative history confirms that "[t]he judge may also impose an adult sentence *if he or she finds that there will be no benefit.*" COMMITTEE REPORT AT 3. These statutory provisions, coupled with such legislative history, do not unambiguously imply, as Judge KING would have it, that the court's findings under § 24–803(d) can be silent or implicit. Indeed, when speaking of court "findings," courts and legislatures typically mean something explicit, on the record, susceptible of judicial review.

Second, a required "statement on the record of the reasons" for granting YRA treatment under § 24–803(c) does not necessarily—and unambiguously—suggest that a judge who denies YRA treatment under § 24–803(d), without having to state reasons why, does not even have to make an explicit, though conclusory, "no benefit" finding. In fact, exactly the opposite inference should be drawn from the requirement of stated reasons in the one instance but not in the other. The Supreme Court in *Dorszynski,* as I shall elaborate in Part II. below, went to great lengths to distinguish the concept of a "no benefit" finding from a more elaborate statement of reasons, and to show why a "no benefit" finding, while simple and conclusory, can be very important, indeed critical, in administering the statute when—in fact, especially when—a statement of reasons is not required. As we shall see, the Supreme Court emphasized in *Dorszynski* the importance—and thus the requirement—of an explicit "no benefit" finding *precisely because* a sentencing court is not required to state reasons for denying Youth Act treatment.

Finally, many witnesses at the hearings before the Council's Committee on the Judiciary referred to positive experiences under the repealed FYCA as reasons for adopting a local YRA to take its place. *See* Appendix. The Council obviously agreed by enacting the YRA. As indicated earlier, however, the YRA departs from the FYCA in requiring a sentencing judge who elects to grant YRA treatment to state on the record the reasons for doing so. *See* D.C.Code § 24–803(c). Nonetheless, in contrast with this policy change, the Council, in borrowing FYCA language for YRA § 24–803(d), see *supra* note 5, neither changed the statutory language nor rejected the *Dorszynski* interpretation of that language. Perhaps the Council made no change because a representative of the Public Defender Service expressly referred to *Dorszynski* and to case law applying *Dorszynski's* analysis. *See* COMMITTEE REPORT Attachment 5 (testimony of Charles J. Ogletree). In any event, no witness suggested withdrawing—and the Council expressed no intention to revisit, let alone withdraw—the traditional requirement that, in declining to grant Youth Act treatment to an eligible offender, the sentencing judge must make an explicit "no benefit" finding. Under such circumstances, we have held that the Council's failure to reject established interpretation of the borrowed federal statutory language—*especially* when the Council affirmatively revises other federal statutory language (as it did in YRA § 24–803(c))—indicates a legislative intent to stick with existing statutory interpretation of the unrevised language. *See Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.,* 506 A.2d 1127, 1129 (D.C.1986) (per curiam) (in adopting District of Columbia workers' compensation statute, based substantially on federal workers' compensation statute, Council was expressly concerned about issues such as vocational rehabilitation and provision of medical services but "did not comment on, or express any

guage, we must conclude the Council intended the trial court to make an express "no benefit" finding when denying YRA treatment to a youth offender.

597 A.2d at 382–83 n. 11.

dissatisfaction with, judicial interpretation of the phrase 'accidental injury' "; accordingly, in adopting the local statute with "no change to the language of the previously applicable act regarding 'accidental injury[,]' " the court concluded "that the Council was satisfied with the interpretation the courts had placed on those words" interpreting the federal statute).

In sum, there is no reason to believe that the Council, in adopting the YRA, decided to scuttle an established interpretation of the same language supplied by *Dorszynski* and later cases. To the contrary, there is every reason to infer that the Council intended to continue the *Dorszynski* policy, applied under the FYCA, so that a sentencing judge, when applying YRA language virtually identical to that in the FYCA, see *supra* note 5, cannot deny YRA treatment for an eligible youth offender without explicitly finding that the offender will not derive benefit from YRA treatment. *See (James) Smith,* 597 A.2d at 382 n. 11.

## II.

Having presented *(James) Smith's* binding analysis and outlined the reasons why the division majority in *Peterson* had no sound basis for summarily rejecting, on the ground of "unambiguous" statutory language, a required "no benefit" finding under § 24–803(d), I proceed to appellant Veney's case and the *Dorszynski* analysis that underlies the proper statutory interpretation and disposition here.

## A.

On February 28, 1992, appellant Veney—then nineteen years old—shot and killed Marc Locust. On January 22, 1993, Veney entered a guilty plea to manslaughter while

armed. In exchange, the government dismissed all other charges.[7]

Veney asked to be sentenced under the YRA.[8] Before sentencing, he submitted three psychological and psychiatric reports that showed he was mentally retarded and emotionally disturbed, and that he had suffered from a history of childhood abuse and neglect. These reports noted that Veney needed counselling and vocational training; they recommended placement in a facility capable of dealing with the mentally retarded. Defense counsel accordingly proposed a sentence requiring incarceration at the Youth Center. Counsel stressed that Veney would "be very vulnerable in the prison system," [9] that he needed psychological and vocational training, and that because "intensive treatment ... is available at the Lorton Youth Center," the court's "greatest assurance for rehabilitating Mr. Veney [would be] to sentence him under the Youth Rehabilitation Act."

The trial court concluded that a YRA sentence would be "inappropriate":

The plea you entered subjects you to a mandatory minimum sentence of five years if you're sentenced as an adult....

With that I compare the Youth Act treatment where I have absolutely no control over the ultimate decision those folks would make when to release you. And although I don't think it would be a very wise decision for them to release you earlier than you would be released as an adult[, u]ltimately, the Court does not have any control over it.

This is a situation where you will receive the benefit of your bargain, but that is about it. *A Youth Act sentence is inappropriate. I'm satisfied that your treatment as an adult will be just as good as it*

---

7.  Veney had been charged with first degree premeditated murder while armed, D.C.Code §§ 22–2401 and 3202 (1989 Repl. & 1994 Supp.), possession of a firearm during the commission of a crime of violence, D.C.Code § 22–3204(b) (1989 Repl. & 1994 Supp.), and carrying a pistol without a license, D.C.Code § 22–3204(a) (1989 Repl. & 1994 Supp.).

8.  The YRA defines a "youth offender" as "a person less than 22 years old convicted of a crime

other than murder." D.C.Code § 24–801(6) (1989 Repl. & 1994 Supp.) Appellant Veney, a twenty-year-old (at time of sentencing) convicted of manslaughter while armed, was eligible for YRA sentencing.

9.  The consulting psychologist had opined that Veney's mental retardation would make him "an easy mark for persons inclined toward predatory and/or sadistic activities."

*would be as a youth.* Therefore, your request for sentencing under the Youth Rehabilitation Act is denied. (Emphasis added.)

Veney consequently received an adult sentence to prison for a term of not less than fifteen years, nor more than life, with five years as the mandatory minimum.

### B.

Veney contends on appeal that the trial judge did not explicitly make the "no benefit" finding required for denial of YRA treatment under § 24–803(d). See *supra* note 5. Well established doctrine bars appellate review of the trial court's sentencing discretion. In contrast, "limited review is available when sentencing discretion is not exercised at all." *Dorszynski,* 418 U.S. at 443, 94 S.Ct. at 3052. *See also Johnson v. United States,* 628 A.2d 1009, 1015 (D.C.1993) ("the sentencing process is subject to appellate scrutiny for abuse"). Because, fundamentally, Veney contends the sentencing judge failed to exercise the kind of discretion required of him under the YRA, we are permitted to review the judge's ruling.

In order to decide whether the trial judge made an explicit "no benefit" finding under the YRA it is important for us to understand FYCA § 5010(d)—the virtually identical statutory predecessor of YRA § 24–803(d)—as interpreted by *Dorszynski.* See *supra* note 5.

In considering the purposes and effects of the FYCA, the Supreme Court stressed in *Dorszynski* that there had been:

> two principal motivating factors behind the enactment of the [Federal Youth Corrections] Act: first, the period of life between 16 and 22 years of age was found to be the time when special factors operated to produce habitual criminals. Second, then-existing methods of treating criminally inclined youths were found inadequate to avoid recidivism.... *The Act was thus designed to provide a better method for treating young offenders convicted in federal courts in that vulnerable age bracket, to rehabilitate them and restore normal behavior patterns.*

*Id.,* 418 U.S. at 432–33, 94 S.Ct. at 3047. Later in the Court's opinion, Chief Justice Burger summarized: the FYCA provided "a new sentencing alternative designed to prevent youthful offenders from continuing their involvement in criminal conduct after the expiration of their sentence." *Id.* at 442, 94 S.Ct. at 3052. In short, the FYCA anticipated the possibility that treatment under the Act would "rehabilitate" youth, "restore normal behavior patterns," and thus cause discontinuance of "involvement in criminal conduct after the expiration of [the FYCA] sentence." *Id.* at 442, 94 S.Ct. at 3052. Under this approach, therefore, when the youth offender predictably would benefit from a FYCA sentence, in the sense of achieving complete rehabilitation, the community necessarily would benefit, for presumably there would be one less recidivist. On the other hand, if a youth offender was not likely to benefit, then presumably there would be some risk to the community from a FYCA sentence, since rehabilitation could not be expected.

The Supreme Court acknowledged there could be some risk to the community from FYCA sentencing in that a Youth Act sentence was intended "to fit the person, not the crime for which he [or she] was convicted." *Id.* at 434, 94 S.Ct. at 3048; *see Ralston v. Robinson,* 454 U.S. 201, 220, 102 S.Ct. 233, 245, 70 L.Ed.2d 345 (1981) (same). Thus, a FYCA sentence would not reflect some of the objectives that govern adult sentencing, such as "serious punishment," *Dorszynski,* 418 U.S. at 438, 94 S.Ct. at 3050, directly aimed at deterring crime by keeping offenders locked up for a long time. The Supreme Court therefore emphasized that, according to the legislative history, district judges were not required to impose FYCA sentences unless they were as sure as they needed to be that offenders would definitely benefit from the FYCA regime. Congress had intended the FYCA "to enlarge, not restrict, the sentencing options of federal trial courts." *Id.* at 436, 94 S.Ct. at 3049. The FYCA "preserved the power of trial judges to sentence youth offenders under 'any other applicable penalty provision,'" *id.* at 436, 94 S.Ct. at 3049; indeed, the Act "was intended to preserve the unfettered sentencing discretion of

federal district judges." *Id.* at 437, 94 S.Ct. at 3049.

According to the Court, the question then became: how to determine "when a judge may sentence a youth offender outside the Act," *id.* at 436, 94 S.Ct. at 3049—*i.e.*, retaining the judge's "unfettered sentencing discretion," *id.* at 437, 94 S.Ct. at 3049, while at the same time making sure that the sentencing judge did not ignore, and thus negate, the offender's statutory right to a discretionary judgment about whether he or she would "derive benefit" from FYCA treatment.

The *Dorszynski* majority resolved the tension created by these two sentencing goals by emphasizing, first, that the FYCA did not create a judicially reviewable substantive standard; it left the sentencing court's discretion entirely intact:

> The 'no benefit' finding required by the Act is not to be read as a substantive standard which must be satisfied to support a sentence outside the Act, for such a reading would subject the sentence to appellate review even though the sentence was permitted by the Act's terms, thereby limiting the sentencing court's discretion.

*Id.*, 418 U.S. at 441, 94 S.Ct. at 3051 (emphasis added). For that reason, said the Court,

> a sentence outside the Act need not be accompanied by a statement of reasons why the court chose such a sentence. The only purpose of such a requirement would be to facilitate appellate supervision of, and thus to limit, the trial court's sentencing discretion.

*Id.* at 441–42, 94 S.Ct. at 3051–52 (emphasis added).

On the other hand, the Court stressed that every eligible youth offender was entitled to the sentencing court's exercise of discretion, *i.e.*, a direct coming-to-grips, "yes" or "no," with the question whether the offender would derive benefit from FYCA treatment. The court could not say "no" without focusing explicitly on the "benefit" issue.

The language of FYCA § 5010(d) made that statutory right to a particular kind of discretion clear. It provided:

> (d) *If* the court shall find that the youth offender *will not derive benefit* under subsection (b) or (c) [providing for FYCA treatment], then the court may sentence the youth offender under any other applicable penalty provision [*i.e.*, as an adult].

(Emphasis added.) The Court accordingly held that (1) although the trial court ultimately had unfettered sentencing discretion, the eligible youth offender at least had a statutory right to the court's discretionary consideration of the FYCA alternative, and that (2) the only way to be sure the sentencing court exercised that discretion—without the appellate court's having to peruse the record to review the exercise of sentencing discretion on a case-by-case basis—was to require the sentencing court, in rejecting FYCA treatment, to make "[a]n *explicit finding* that [the offender] *would not have benefited* from treatment under the Act." *Id.* at 444, 94 S.Ct. at 3053 (emphasis added). Or, as the Court put it a paragraph earlier, "[l]iteral compliance with the Act [could] be satisfied by any expression that [made] clear the sentencing judge considered the alternative of sentencing under the Act and decided that the youth offender *would not derive benefit* from treatment under the Act" (emphasis added). *Id.* But the Court was unequivocal: the "no benefit" finding had to be "clear." [10]

---

**10.** *See United States v. Fernandez,* 748 F.2d 71, 73 (2d Cir.1984) (interpreting *Dorszynski* as requiring an "expression by the district judge that ... 'makes clear' that he decided [that the youth offender] would not benefit from treatment under the Act" and remanding case because "it appears that the district court focused on the crime committed and ignored [the youth offender's] possible benefit from YCA treatment"); *Puente v. United States,* 676 F.2d 141, 143–144 (5th Cir.1982) (applying *Dorszynski* retroactively and holding that, even though trial judge's law clerk's letter to appellant showed that trial judge had "considered treatment provisions of the [Federal Youth Correction] Act and had rejected them," the letter did not clarify whether the judge concluded "no benefit would be derived from treatment" and, therefore, did not meet *Dorszynski's* "no benefit" finding requirement); *Thompson v. Carlson,* 624 F.2d 415, 422 (3d Cir.1980) (upholding imposition of adult sentence when youth offender was already serving a FYCA sentence, where trial court made explicit finding that the youth offender would not benefit from FYCA treatment); *United States v. Fortes,* 619 F.2d 108, 126 (1st Cir.1980) ("By stating that it felt somehow bound to follow the previ-

This meant, of course, that the reviewing court would never consider whether the sentencing judge *correctly* found no benefit; it would consider only whether the sentencing judge, *in fact,* had exercised its discretion on that issue. It followed that any sentencing judge, acting without fear of substantive judicial review, could lawfully find "no benefit" under the FYCA even though scores of other sentencing judges considering the same record—indeed, even though any reasonable judge—would, to the contrary, find likely benefit from FYCA treatment. Because the substance of the sentencing judge's discretion, therefore, could never be scrutinized, the Supreme Court held it to be especially important that, in denying FYCA treatment, the sentencing court at the very least had to make clear, explicitly, that it had found "no benefit." See *supra* note 10.

Without doubt, therefore, the Supreme Court concluded that an explicit "no benefit" finding was required under FYCA language virtually identical to YRA § 24–803(d), see *supra* note 5, and explained why such a finding was so important in a context where the sentencing judge was not required to state reasons for denying Youth Act treatment. Without an explicit finding of no benefit, the Court said, the reviewing court could never be sure that the trial court, in exercis-

ing its unfettered unreviewable sentencing discretion, had actually considered, and thus come to grips with the purposes of, the Youth Act regime. Put most succinctly, it was precisely because stated reasons for denial were *not* required that an explicit finding of no benefit *was* required.

The most critical flaw in the *Peterson* majority's reasoning, therefore, is the notion that the very requirement of stated reasons for a finding of probable benefit from YRA treatment, see D.C.Code § 24–803(c), necessarily implies that a "no benefit" finding is not required, in the absence of a required statement of reasons, when YRA treatment is denied, see *id.* § 24–803(d). As we have seen, the Supreme Court made crystal clear in *Dorszynski* that a "no benefit" finding and a statement of reasons are conceptually distinct and serve quite different purposes. Thus, the § 24–803(c) requirement of stating reasons when the sentencing judge grants YRA treatment in no way can be said to negate the need—and, indeed, the § 24–803(d) requirement—for an explicit "no benefit" finding when YRA treatment is denied. These two kinds of requirements are unrelated species. Because this particular statutory language analysis is Judge KING's only ground for holding in *Peterson* that a "no benefit" finding is not required under the

---

ously imposed Connecticut adult sentence and that but for that sentence it would have granted the requested Youth Act disposition the district court indicated that while, as mandated by *Dorszynski*, it had 'considered the alternative of sentencing under the Act' it had not, as also required by that decision, 'decided that the youth offender would not derive benefit from treatment under the Act' "); *Goodwin v. United States*, 602 F.2d 107, 110 (6th Cir.1979) (applying *Dorszynski* and holding that "an adult sentence imposed upon a youth offender is unlawful unless the sentencing court has at least exercised its discretion as required by § 5010(d) [and made an explicit no benefit finding], although the substantive outcome of that exercise is not subject to review"); *Lawary v. United States*, 599 F.2d 218, 220–225 (7th Cir.1979) (although trial judge failed to make explicit finding that youth offender would not benefit from Youth Act treatment— as required by *Dorszynski*—and focused on offender's prior convictions in sentencing him as an adult, "the *Dorszynski* requirement of an explicit no benefit finding does not apply retroactively"); *United States v. Hopkins*, 174 U.S.App. D.C. 244, 247, 531 F.2d 576, 579 (D.C.Cir.1976) (case remanded because, although trial judge

"clearly considered FYCA sentencing," he did not explicitly find that the youth offender would "not derive benefit from treatment under the Act" as is required under *Dorszynski* ); *Brager v. United States*, 527 F.2d 895, 897 (8th Cir.1975) (applying *Dorszynski* retroactively and remanding case because in post-conviction proceeding "district court did not undertake to make any explicit finding that in October, 1970, when he was sentenced, or at any later time, petitioner would have derived no benefit from treatment under the Act"); *Rewak v. United States*, 512 F.2d 1184, 1186 (9th Cir.1975) (while not reaching the question of whether *Dorszynski's* explicit no benefit finding could be retroactively applied, court held that petitioner had been improperly sentenced because "not only had the sentencing court failed to make an explicit 'no benefit' finding, but that such a finding could not even be implied from the record as a whole"); *Roddy v. United States*, 509 F.2d 1145, 1146–1147 (10th Cir.1975) (interpreting *Dorszynski* as imposing only one limitation on sentencing discretion of trial judges under the Youth Act: "the requirement of finding 'no benefit' under the Act before sentencing a person under the age of twenty-two years to an adult sentence").

YRA, the conceptual flaw on which he relies—revealed by the Supreme Court's analysis in *Dorszynski*—shows why the result he dictates is plainly wrong.

I had thought this court made clear enough in *(James) Smith* that an explicit "no benefit" finding was required in every case under the YRA, not just when probation was revoked. The foregoing analysis drawn from *Dorszynski*, as understood and applied in the federal circuit courts of appeals, see *supra* note 10, makes even clearer why such an explicit finding is necessary to assure the very functioning of a Youth Rehabilitation Act that purports to couple the judge's unfettered sentencing discretion with an eligible youth offender's right to discretionary consideration of YRA treatment. I would so hold.

### C.

The next question—indeed, the only legal question under the YRA presented in *Veney* and in *Peterson*—is what exactly is meant by a "no benefit" finding under § 24-803(d). The Supreme Court in *Dorszynski* may have *conceptually* resolved the tension between the sentencing judge's unfettered discretion, on the one hand, and the offender's right to the judge's attention to the "benefit" issue, on the other, by requiring an explicit "no benefit" finding, without further appellate scrutiny, if the judge rejected YRA treatment. But the Court left reviewing courts a problem by declining to require the sentencing judge, without exception, to use the very words "no benefit" or "will not derive benefit." Because the Court allowed an explicit "no benefit" finding to mean "any expression that [made] clear the sentencing judge considered" and rejected FYCA treatment, *id.*, a reviewing court could not be sure that the sentencing judge actually made a "no benefit" finding, when such words were not explicitly used, unless it was clear what the statutory norm, "will not derive benefit," meant. Thus, in a case such as this where the sentencing judge does not use the statutory words, we must ascertain that meaning for the YRA.

The Supreme Court, of course, supplied the required interpretation for the FYCA in *Dorszynski*, as indicated at the outset of this discussion: the focus was on rehabilitation, leading to restoration of sound behavior patterns, and thus to discontinuance of criminal conduct upon expiration of the FYCA sentence, *see id.* at 433, 94 S.Ct. at 3047—in short, a benefit personal to the offender that happened to serve, equally, as a benefit to the community from the offender's complete rehabilitation.

This is not to say that the sentencing judge, in imposing a FYCA sentence, had to be 100 percent, or even 50 percent, sure that the offender's FYCA rehabilitation would achieve the goal of removing the offender forever from the criminal milieu; the sentencing judge had discretion to take risks of failure from Youth Act sentencing. At the same time, however, a sentencing judge had the discretion to find "no benefit," within the meaning of the FYCA, if the judge could not be satisfied that there was considerable— indeed, virtually conclusive—reason to believe that the youth would achieve rehabilitation to the point of no longer being a criminal threat to society.

It is important to be clear at the outset that under the YRA, as under the FYCA, the "benefit" at issue is benefit, personally, to the youth offender. The statute authorizes a YRA sentence "[w]here the court finds that ... the *youth offender* will derive benefit," D.C.Code § 24-803(c) (emphasis added), and authorizes the judge to refuse a YRA sentence "[i]f the court shall find that the *youth offender* will not derive benefit." D.C.Code § 24-803(d) (emphasis added). The legislative history, reflected in testimony at the public hearing and in the legislative committee report itself, shows that the Council, like the Congress that enacted the FYCA, intended the benefit to be an opportunity for "rehabilitation." COUNCIL OF THE DISTRICT OF COLUMBIA COMMITTEE ON THE JUDICIARY, REPORT ON BILL 6-47, YOUTH REHABILITATION ACT OF 1985 (COMMITTEE REPORT) 2 (1985); see Appendix (summarizing legislative testimony). More specifically, the Council Committee announced that the purpose of the YRA would be

to provide *rehabilitation opportunities* for deserving young adult offenders between

the ages of 18 and 22 while incarcerated, *and at the same time fully protect the public safety* by enabling the court to impose a maximum penalty where warranted. *Id.* (emphasis added).

In short, as under the FYCA, the YRA's required "no benefit" finding means that, before a trial judge may impose an adult sentence on an eligible youth offender, the judge must make an explicit determination that the offender will not be amenable to treatment, leading to rehabilitation, under the YRA. *See United States v. Hopkins,* 174 U.S.App.D.C. 244, 247, 531 F.2d 576, 579 (1976) (requirement of express finding of no benefit ensures not only that sentencing court is aware of FYCA "but also that it focused on amenability to treatment"). The purpose of this requirement is, very simply, to assure the appellate court that the trial court has considered the controlling factor—amenability to treatment leading to rehabilitation—in declining to impose a YRA sentence. *See id.* Consequently, when the appellate court cannot determine from the record that the trial court considered and rejected that particular kind of benefit to the offender, the court must remand for resentencing.[11]

As indicated in the Committee Report, the Council, in adopting the YRA, was concerned "at the same time" about "fully protect[ing] the public safety by enabling the court to impose a maximum penalty where warranted." Committee Report at 2. This reference to "public safety," however, does not suggest that the sentencing court engage in a discretionary weighing of potential benefits to the offender from YRA treatment against the potential harm to the community from such treatment; reflecting the FYCA, the statutory language of the YRA—limiting the court's finding to benefit or no benefit to the "youth offender" alone—permits no such exercise.[12] See *supra* note 10. The court, rather, is to focus exclusively on the rehabilitation that can be expected under the YRA, the assumptions being that—as under the FYCA, as interpreted by *Dorszynski*—(1) if rehabilitation can be anticipated, the public will benefit from a decision to impose a YRA sentence (presumably resulting in adequate protection against the possibility of recidivism), but that (2) if YRA treatment is not likely to produce rehabilitation, the public will benefit instead from rejection of a YRA sentence (presumably resulting in protection by reason of the offender's incarceration in an adult facility).

It bears emphasis, as elaborated in the discussion of *Dorszynski,* that in considering benefit to the youth offender, the sentencing court, in its discretion, may, but need not,

---

11. In enacting the YRA, the Council determined that youth offenders convicted of murder would not be eligible for YRA sentencing. *See* D.C.Code § 24–801(6) (1989 Repl. & 1994 Supp.). This reflects a legislative determination either that convicted murderers are not amenable to rehabilitation or, more likely, that the danger such offenders pose to society creates a risk that outweighs possible benefits to the offenders from YRA sentencing. This one exception to the availability of YRA treatment for youths under age 22 reinforces the traditional interpretation, well-established by *Dorszynski,* that benefit to the youth offender—*i.e.,* amenability to treatment leading to rehabilitation—is the court's exclusive focus when considering YRA sentencing. *See Hopkins,* 174 U.S.App.D.C. at 247, 531 F.2d at 579.

12. Judge Schwelb suggests, *ante* at 631, that *(James) Smith* expressly recognizes the sentencing judge's authority under the YRA to balance benefit to the offender against benefit to the community. He is wrong. The portion of the opinion (and the particular quotation) on which he relies is not addressing YRA benefit analysis. Rather, it is considering the question whether, in revoking probation (an issue different from deciding whether to impose a YRA or an adult sentence), the sentencing court must "expressly state on the record how it balances 'the competing interests of the community in safety with the rehabilitative goals of probation'" (we held the court need not). *Id.,* 597 A.2d at 383 (*quoting Saunders v. United States,* 508 A.2d 92, 95 n. 6 (D.C.1986) and *citing Black v. Romano,* 471 U.S. 606, 105 S.Ct. 2254, 85 L.Ed.2d 636 (1985)). YRA benefit analysis begins when, *after* the court has decided to revoke probation, it must decide whether to impose YRA incarceration and treatment or adult imprisonment. There is a significant difference between a decision whether to revoke probation—which necessarily balances community safety against the rehabilitative benefits of probation—and a decision whether to impose YRA or adult incarceration, where the community is implicitly protected by a regime of incarceration and benefit to the youth offender is the controlling focus in determining what regime should be imposed.

define "benefit" in ultimate terms, *i.e.*, in terms of total rehabilitation, such that anything less to be expected from a YRA sentence would justify a finding of "no benefit." I note again that the Council Committee announced that the YRA's purpose was "to provide rehabilitation opportunities for deserving youth adult offenders," while "at the same time fully protect[ing] the public safety by enabling the court to impose a maximum penalty where warranted." Committee Report at 2. Through this formulation, I believe the Committee was reflecting the *Dorszynski* analysis that defined "benefit" in terms of "rehabilitat[ion]" to the point of "restor[ing] normal behavior patterns" that will result in the offender's discontinuance of "involvement in criminal conduct after the expiration of [the] sentence." *Id.*, 418 U.S. at 433, 442, 94 S.Ct. at 3047, 3052. Absent the likelihood of the offender's substantially complete rehabilitation, therefore, the sentencing court will be justified in finding (though not compelled to find) that the offender "will not derive benefit" from a YRA sentence.[13]

### D.

I turn, finally, to the sentence at issue here. The government contends that when a finding of "no benefit" is clear from the record, it is not necessary for the court in any way "to parrot the statutory words" in denying application of the YRA. *Taylor v. United States*, 324 A.2d 683, 685 (D.C.1974). Rather, says the government, the record itself can constitute the court's explicit "no benefit" finding. The government then asserts that, under this approach, the trial court effectively found "no benefit" when it concluded that a YRA sentence would be "inappropriate," because the record shows the court based its conclusion on consideration of the violent nature of the offense, the inherently longer (here, mandatory minimum) sentence as an adult, and a recognition of the availability of comparable treatment in

an adult facility. According to the government, these considerations, taken together, amounted to an explicit finding that the appellant would not benefit from a YRA sentence.

Appellant Veney, on the other hand, points out that even though a judge does not have to use the magic words "no benefit," or "will not derive benefit," this court has held that "there nonetheless must be an explicit expression" to the effect that the offender would not benefit from treatment under the Act. *(Curtis) Smith v. United States*, 330 A.2d 519, 522 (D.C.1974) (citing *Dorszynski* ). Veney then stresses that none of the trial court's considerations—seriousness of offense, length of incarceration, and comparable treatment at adult prisons—addressed the critical question whether Veney would, or would not, benefit from a YRA sentence.

I agree with the government to this extent: we have upheld denial of YRA sentences in the absence of "no benefit" language when the record has unmistakably shown that the trial court found the defendant would not benefit from YRA sentencing. *See Bettis v. United States*, 325 A.2d 190, 198 (D.C.1974) (trial judge deemed to have incorporated into denial of Youth Act sentence experts' reports recommending defendant not be sentenced under Youth Act[14]); *Taylor*, 324 A.2d at 684–685 (trial judge's reading of defendant's records showing extensive involvement with police, courts, and correctional system—including prior sentences under Youth Act—constituted explicit finding of "no benefit"). Each case, however, turns on its own facts.

As both parties agree, the trial court, in denying Veney a YRA sentence, considered the seriousness of his offense, the greater length of incarceration at adult prisons, and the comparability of treatment at adult facilities—factors leading the court to conclude that a YRA sentence would be "inappropriate." It is easily apparent that none of these considerations reflects a finding that Veney would not benefit from YRA treatment, nor

---

13. With respect to Judge Schwelb's criticisms of this Part II. C., I will simply say that I do not recognize the opinion he purports to be critiquing.

14. The Classification Committee of the Youth Center, the Superintendent [of the Youth Center], and the Board of Parole all agreed that appellant should be sentenced as an adult. *See Bettis*, 325 A.2d at 198.

does any of them lead to an inference to that effect.

In the first place, although the seriousness of Veney's offense, manslaughter while armed, reflects a degree of criminality that presumably makes rehabilitation more difficult than the treatment required for lesser offenders, that obvious concern does not necessarily preclude rehabilitation, and thus benefit, from YRA sentencing. Absent an explicit "no benefit" finding, the court's reliance on a seriousness-of-offense factor to impose an adult sentence reflects deterrence and punishment rationales which, in themselves, do not indicate that the court focused on rehabilitation.

Again, the court's second category of concerns—that the court favored at least a five-year mandatory minimum sentence that would be imposed on Veney as an adult, and that the sentencing judge would have no control over the release date under a YRA sentence—does not reflect a "no benefit" finding. This case is similar to *(Curtis) Smith*, where we concluded that the sentencing judge did not make an explicit "no benefit" finding when he stated that he would not consider a Youth Act sentence "[u]ntil such time as something is done with the Youth Center, which puts [defendants] out inside of eleven months." *Id.*, 330 A.2d at 522. As in *(Curtis) Smith*, the trial court here did not focus on treatment and rehabilitation in expressing concern about the length of time Veney would serve; deterrence and punishment, once again, appear to have motivated the court.

Finally, the court did mention treatment when opining that it was satisfied Veney's "treatment as an adult will be as good as it would be as a youth." In one important sense, however, that statement is inherently untrue, and thus cannot be considered part of a "no benefit" finding. At the very least, the Council's Judiciary Committee recognized that one fundamental aspect of YRA sentencing, separation of youth from the general prison population, is advantageous in itself since it affords "deserving young persons a chance to reform in a more insulated environment." COMMITTEE REPORT AT 3. Furthermore, as Veney points out, the trial court's own views about the respective lengths and qualities of a youth's treatment in a YRA facility and of the youth's incarceration in a prison are irrelevant in assessing "benefit" or "no benefit"; the Council enacted the YRA based on legislative findings that the YRA scheme, as such, is inherently more therapeutic for youths under age 22 than the prison system. The YRA may provide "no benefit" for a particular youth offender, but not because the prisons are "just as good." [15]

The present case differs from those cited by the government, such as *Bettis* and *Taylor*, in which we have concluded that the trial court made an explicit "no benefit" finding, despite the failure to use words to that effect. There is no indication on this record that the trial court considered whether appellant Veney would, in some way, benefit—in the sense of anticipated rehabilitation—from YRA treatment. In contrast with *Bettis*, 325 A.2d at 198, I cannot say the trial judge incorporated an expert report or finding that showed Veney would not gain from YRA sentencing; to the contrary, the only expert reports submitted to the court appeared to favor YRA sentencing. Similarly, unlike the defendant in *Taylor*, 324 A.2d at 683, who had not been rehabilitated by previous FYCA treatment (implying that he would not benefit from another Youth Act sentence), appellant Veney came before the court on a first offense.[16]

---

**15.** I do not find in the record any basis for saying the trial court found that YRA facilities were unequipped to deal with Veney's particular problems. Nor can I find any indication the court concluded that a longer period of incarceration in an adult prison would be important for Veney's rehabilitation.

**16.** The government also relies on *Tribble v. United States*, 447 A.2d 766, 774 (D.C.1982) (concluding that "the trial court properly considered appellant's apparent mental and emotional instability in ruling that he would not benefit from treatment available under the [Federal] Youth [Corrections] Act" and implying that it was proper for the trial court to consider "the nature and gravity of the offense ... in deciding whether appellant would benefit from a Youth Act sentence.") The government's reliance is misplaced because the appellant in that case had not questioned whether the trial court's finding—that FYCA sentencing was "not the appropriate manner in which the Court should sentence you"—

My analysis of the trial court's proffered reasons for denying appellant YRA treatment, especially when seen in the light of the cases the government cites, makes clear that the trial court used honest and accurate language to summarize its own reasons for denying YRA treatment: it would be "inappropriate" given the trial court's particular concerns that did not emphasize Veney's rehabilitation. In context—and given the interpretation supplied by *Dorszynski* which had been incorporated into the FYA, *see (James) Smith*, 597 A.2d at 382—I cannot say the trial court here meant "no benefit."

The foregoing lengthy analysis is responsive to *Dorszynski's* and *(James) Smith's* admonition that absence of the so-called magic words, "no benefit" or "will not derive benefit," will not be fatal to a court's rejection of YRA treatment for eligible offenders as long as the court uses words that can only be construed to mean "no benefit." The court's failure to use such words in this case, however, did turn out to be fatal, in my judgment, because a "no benefit" analysis, as understood from *Dorszynski*, was not attempted. If the statutory words are used, of course, then lengthy opinions sorting out what was intended would not be necessary. *Cf. Ralston*, 454 U.S. at 219, 102 S.Ct. at 244 (referring to FYCA probation revocation:

"In the future, we expect that judges will eliminate interpretive difficulties by making an explicit 'no benefit' finding with respect to the remainder of the YCA sentence.").

Respectfully, therefore, I dissent. I would vacate Veney's sentence and remand for resentencing.

## APPENDIX

Of the 29 appearances before, and letters to, the Committee on the Judiciary relating to the May 8, 1985 hearing on Bill 6-47, which was later codified as the District of Columbia Youth Rehabilitation Act, D.C.Code §§ 24-801 *et. al.* (1989 Repl. and 1994 Supp.), 25 supported the bill on the basis of a perceived need in the District for legislation focusing on the rehabilitation of youth offenders. Of the remaining four presentations, one took the position that the previous bill, focusing on rehabilitation of youth offenders, put too much emphasis on the court's making psychological determinations. The other three, while acknowledging the rehabilitative purpose of the bill, urged greater consideration of public safety and greater focus on victims of the crimes perpetrated by youth offenders. Excerpts from all the presentations before, and letters to, the Committee on Bill 6-47 are provided below.

---

1. Cheryl M. Long, Director, Public Defender Service for the District of Columbia

The need for a strong and effective Youth Rehabilitation Act is obvious: ... Some mechanism must be provided for separating, evaluating and sentencing young people who, in the view of the trial court, *have the potential for rehabilitation and who would not return to the community and continue to commit criminal acts if that special treatment is successful.* [Emphasis added.]

2. Charles J. Ogletree, Deputy Director, Public Defender Service for the District of Columbia

Judges and attorneys know that the Federal Youth Corrections Act ... clearly had a positive impact not only on individual youth-

amounted to a "no benefit" finding. *Id.* at 773. Indeed, we noted "[a]ppellant agrees that the trial court made an explicit finding of no benefit." *Id.* at 774. The appellant in *Tribble* claimed only that the court's "no benefit" finding had an inadequate record basis. We sustained the trial court's sentence, noting that "arguments premised solely on the factual basis of a no benefit finding do not support an appellate ruling

that the trial court abused its sentencing discretion." *Id.* Furthermore, even if one could characterize *Tribble* as a "no benefit" case—which I do not—the trial judge demonstrated he had considered benefit to the defendant by stating that, in his experience, use of the FYCA had not dealt well with serious mental problems of the sort the defendant exhibited. *See id.* at 773. There is no comparable statement here.

ful offenders but also on the community at large.... These beneficial results flowed from the Youth Act's *emphasis on rehabilitation....* *For the community, rehabilitation is the only long term solution to crime.* [Emphasis added.]

3. Dr. Calvin W. Rolark, President, United Black Fund

One of the greatest needs I can think of is to give a deserving youth a chance to reform his or her life.... Our agencies [that] serve such young adults find that *these lives can be turned around with rehabilitation, job and academic counseling and concern administered in an insulated setting.* [Emphasis added.]

4. Rev. Jerry A. Moore, Jr.

[Bill 6–47] offers an opportunity for *reconstruction of lives of young men and women* who, otherwise, might be consigned to the scraphill of life. These people are valuable resources and *must be reclaimed for useful purposes in our society.* [Emphasis added.]

5. Ronald Hampton, National Chairman, National Black Police Association

I have been a Community Relations Officer for the past seven years ... and have seen the positive effects that time and *corrective* guidance can have to *eliminate the antisocial tendencies* that are embedded in some of our youth. [Emphasis added].

6. Willie T. Hamlin, M.D., Institute for Child and Family Psychiatry, Inc.

The Institute ... fully supports "The Youth Rehabilitation Act of 1985," with its stated purposes being to *regulate the rehabilitation and punishment of our youthful offenders....* To offer our youth and community anything less than a *comprehensive model program for rehabilitation* would be a continued form of abuse, neglect and abandonment of both parties. [Emphasis added]

7. M. Shanara Gilbert, Chairperson, National Conference of Black Lawyers

The Federal Youth Corrections Act was intended historically to *replace retribution and punishment with nurturing and training....* We appreciate the Council's approach of turning anger and frustration with youth crime into reason and a *constructive approach to the prevention of future criminality* and therefore we urge the passage of the bill.... [Emphasis added.]

8. Stephen G. Milliken, Attorney-at-Law

This legislation recognizes a fundamental precept in the *potential for rehabilitation in young people....* [Emphasis added.]

9. J. Wesley Watkins, Executive Director of the American Civil Liberties Union of the National Capital Area

We think the Youth Rehabilitation Act will reinstitute a humane and necessary sentencing option for judges in the District.

10. Baker E. Morten, Unfoldment, Inc.

Bill 6–47 would restore certain provisions of the former Federal Youth Corrections Act

and *provide rehabilitation opportunities* for deserving youthful offenders.... [Emphasis added.]

11. Carrolena Key, Vice Chairperson, D.C. Commission for Women

The D.C. Commission for Women support the concept of Bill 6–47 *to regulate the rehabilitation and punishment of youth offenders* ... and agree that early passage of legislation *to provide a system of treatment and rehabilitation for young offenders* is extremely urgent. [Emphasis added.]

12. Ralph Reynaud, D.C. Youth Parole Officer

[T]he necessity of an appropriate law to take the place of the FYCA ... is fulfilled in the proposed YRA–85 which would *regulate the rehabilitation and the punishment of D.C. Youth Offenders through the treatment process.* [Emphasis added.]

13. Rudolph H. Yates, Efforts From Ex–Convicts

A Youth Facility is needed to *work with those offender[s] who can be saved.* [Emphasis added.]

14. Daniel McKinney, Youth Ex–Offender

Bill 6–47 ... gives the youth the opportunity to see the mistake and use the time to *rehabilitate himself....* [Emphasis added.]

15. Matthew Curtis, Youth Ex–Offender

*I believe everyone deserves a second chance....* The benefits of a youth act can be seen through its school, trades, and programs. [Emphasis added.]

16. Arnold Bellinger, Youth Ex–Offender

Without [the Youth Act, youth offenders] would have been warehoused in prison making no contribution to society. *Because of the Youth Act, I was able to return to my job and continue as a free and productive member of the community.* [Emphasis added.]

17. Donald F. Sullivan, Executive Director, National Capitol Area Region, The National Conference of Christians and Jews

I strongly support The Youth Rehabilitation Act ... because it would provide *a better method for treating young offenders with a goal towards rehabilitation and making them productive members of society.* [Emphasis added.]

18. Reginald G. Addison, Past Vice–President, Board of Governors of the Superior Court Trial Lawyers Association

The harsh reality is that we must try to *rehabilitate youths convicted of crimes.... Rehabilitation is as beneficial to the community as it is to those who receive it.* [Emphasis added.]

19. Bernard M. Nedab, Group Homes

[I]t is societ[y's] responsibility to at least be certain each individual receives the *opportunity to become a self-respecting, productive part of his community.* [Emphasis added.]

20. Kim A. Taylor, Co–Chairperson, Criminal Law and Individual Rights, District of Columbia Bar

[T]his legislation, in effect, would inform the Federal government that *we* will not turn *our* backs on the District's troubled youth [emphasis in original]. Rather, we will provide a *constructive rehabilitation program.* . . . [Emphasis added.]

21. Michael Zeldin and Susan Schneider, Co-chairpersons, Division V (Criminal Law and Individual Rights) of the District of Columbia Bar, Committee on Criminal Rules and Legislation

The Youth Act . . . provided for the *special treatment of some young offenders* . . . [who] were segregated from the adult prison population . . . to prevent the exposure of youth offenders to a more hardened . . . criminal element. . . . These youth offenders also received more *intensive guidance, counselling and educational training.* [Emphasis added.]

22. Lillian M. Queen, Staff, Crime and Criminal Justice Task Force, Office of Social Development, Archdiocese of Washington

[The FYCA] *provided rehabilitation for young offenders.* . . . We ask that you act with haste . . . to get the *adoption of the repealed act . . . [to] fill the void left in the City's criminal laws.* [Emphasis added.]

23. Retna M. Pullings, Attorney-at-Law

Emphasis should be [on] the *educating and training of youthful offenders.* . . . [Emphasis added.]

24. William F. Dow, III, Former Staff Attorney, Public Defender Service of the District of Columbia

[A] viable alternative must be available to those young people . . . who have been convicted of criminal offenses and who deserve *special treatment because of their youth.* [Emphasis added.]

25. Dr. Kelsey A. Jones, Professor and Chairman, The Department of Criminal Justice, The University of the District of Columbia

We react to "crime" while remaining ambivalent toward the criminal. The criminal, like each of us, is an individual.

26. Rev. Samuel McPherson, Juvenile Counselor at the Southeast House and the P.I.N.S. Center

The approach to dealing with the regulating of *"the rehabilitation and the punishment of youth offenders"*, . . . [in] Bill 6–47, places much onus on the Courts to *make psychological and sociological determinations as they relate to the youth offender,* without identifying within the court's purview, definitive programs or projects. [Emphasis added.]

27. Rimsky Atkinson and John Gibson, Cochairs, Citizen's Advisory Committee to the District of Columbia Bar

Legislation *must protect all members of society from unreasonable risks of criminal victimization,* while at the same time *providing treatment and rehabilitative interventions* for youthful offenders. . . . The right to rehabilitative services as an alternative to regular sentencing should be afforded to an individual only once. [Emphasis added.]

28. Thomas H. Downs, City Administrator/Deputy Mayor for Operations

The Bill corresponds with the executive's determination in that: *the sentencing goal is rehabilitation....* That overall goal, however, ha[s] to be addressed within a context of *public safety and prison management concerns.* [Emphasis added.]

29. Carl M. Rogers, Ph.D., Associate Director, Division of Child Protection, Children's Hospital National Medical Center

We recognize the intent of these provisions in terms of *promotion of rehabilitative efforts* and our collective desire not to unduly stigmatize the rehabilitated youthful offender.... We are concerned that the Act ... neither acknowledges, nor makes provision for consideration of, the *impact of the offender[']s criminal behavior on the victim.* [Emphasis added.]